

FILED

MAY 1 7 2022

CARMELITA REEDER SHINN, CLERK
BY _____ *KM* _____
,DEPUTY

JD

## IN THE UNITED STATES DISTRICT COURT FOR THE

## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. CR 22-209 _____ |
| Plaintiff, | ) | |
| | ) | Violations: 18 U.S.C. § 1349 |
| -vs- | ) | 18 U.S.C. § 1346 |
| | ) | 18 U.S.C. § 1343 |
| BLAINE DYER and | ) | 18 U.S.C. § 1014 |
| JAMES ("JIMMY") DYER, | ) | 18 U.S.C. § 981(a)(1)(c) |
| | ) | 18 U.S.C. § 982(a)(2) |
| Defendants. | ) | 28 U.S.C. § 2461 |

## I N D I C T M E N T

The Federal Grand Jury charges:

## Introduction

At all times relevant to this Indictment:

1.      Continental Resources, Inc. ("Continental" or "CLR") was an independent oil and gas exploration and production company based in Oklahoma City, Oklahoma, that operated throughout Oklahoma, Texas, Arkansas, and elsewhere.  A significant portion of Continental's business involved locating oil and gas reservoirs, acquiring the legal rights to drill oil and gas wells by purchasing or leasing minerals within those reservoirs, and extracting and producing oil and gas for profit.

2.     From in or about March 2011 through in or about March 2020, Justin Biggs ("Biggs") was employed as a Senior Landman at Continental.   As a Senior Landman, Biggs purchased and leased minerals on behalf of Continental.   Pursuant to this role, Biggs was privy to Continental's confidential drilling and leasing plans, including where Continental wanted to drill and how much money Continental was willing to pay to purchase or lease certain mineral rights in those drilling locations.

3.     **BLAINE DYER** ("**BLAINE**") and Mitchell K. Coatney ("Coatney") were attorneys based in Edmond, Oklahoma, who specialized in oil and gas title examination—in other words, determining who owned mineral rights that oil and gas companies like Continental wished to acquire.   In or about August 2011, Biggs hired **BLAINE** and Coatney to perform oil and gas title work for Continental.

4.     **JAMES ("JIMMY") DYER** was a landman by trade, and **BLAINE**'s cousin.

5.     Unindicted Coconspirator was also related to **BLAINE**.

2

## The Conspiracy to Defraud Continental

### COUNT ONE
### (Conspiracy to Commit Honest Services Wire Fraud)

6.      The Federal Grand Jury incorporates paragraphs 1-5 by reference.

7.      From in or about December 2013 through in or about June 2020,

---------------------------------------**BLAINE DYER and**
                                        **JAMES ("JIMMY") DYER**,--------------------------

knowingly and intentionally, and with interdependence, combined, conspired,
and agreed with Biggs, Coatney, Unindicted Coconspirator, and others to
commit the offense of honest services wire fraud, in violation of Title 18, United
States Code, Sections 1346 and 1343.

### The Object of the Conspiracy

8.      The object of the conspiracy was to enrich **BLAINE**, **JIMMY**,
Biggs, Coatney, and others through the unlawful use and exploitation of
Continental's confidential drilling and leasing plans that Biggs provided by
virtue of his employment with Continental.

### Manner and Means

9.      The object of the conspiracy was accomplished as follows:

A.      On or about November 23, 2013, **BLAINE**, **JIMMY**, Biggs,
Coatney, and others went on a hunting trip to Tipton, Oklahoma.   During the

3

trip, **BLAINE** proposed that Biggs provide **BLAINE**, **JIMMY**, Coatney, and others with Continental's confidential drilling and leasing plans in exchange for kickback payments.

B.    Biggs, as the Continental insider, provided **BLAINE**, **JIMMY**, Coatney, and others with maps, drilling schedules, and other information detailing what leaseholds Continental planned to acquire, and how much Continental was willing to pay for them.

C.    **BLAINE** and Coatney, as oil and gas attorneys, used the confidential information that Biggs provided to conduct title research, determining who owned the land and minerals that Continental wished to acquire.

D.    **JIMMY**, as a landman, interacted and negotiated directly with land and mineral owners to acquire the leases that Continental planned to acquire, before Continental or other oil and gas companies acquired them.

E.    Unindicted Coconspirator created and maintained a spreadsheet detailing leaseholds that the coconspirators acquired with Continental's proprietary information.  She also assisted **BLAINE**, **JIMMY**, and others with land and mineral lease acquisition.

F.    To avoid detection, **BLAINE**, **JIMMY**, and others formed

4

numerous entities—including Enercore Resources LLC ("Enercore")—through which they purchased and leased the minerals of interest, then re-sold and re-leased those minerals to Continental and other oil and gas companies.   The coconspirators convinced Individual 1 to serve as the "face" of Enercore, allowing the coconspirators to further conceal their affiliation with the company.

G.   **BLAINE** agreed that he would pay Biggs a kickback of 30% of any profits that his (Biggs') insider information yielded.   **BLAINE** and Coatney agreed that they would each also receive 30% of the resulting profits, with the remainder to be divided amongst **JIMMY** and others involved in the conspiracy.

H.   **BLAINE**, **JIMMY**, Biggs, Coatney, and Unindicted Coconspirator exchanged hundreds of preserved text messages detailing their plans to exploit and their exploitation of Continental's confidential information.

## Acts in Furtherance of the Scheme to Defraud

10.   In order to effect the object of the conspiracy, **BLAINE**, **JIMMY**, Biggs, Coatney, Unindicted Coconspirator, and others committed the following overt acts, among others:

A.   On or about December 5, 2013, **BLAINE** emailed Biggs and

5

Coatney about the scheme. **BLAINE** stated: "There are a million different ways to swing this and get rich . . . . If we do this right, we'll be sipping on umbrella drinks at 35 . . . watching our fortunes gain interest and continue to grow from producing wells." In the email, **BLAINE** suggested that Biggs use an account that would render Continental unable to track his actions, and that the coconspirators make calls "from go phones so no caller ID comes up" or "register phones under company names."

B. On or about January 7, 2014, **JIMMY** texted Coatney: "Biggs just called back and said give him the $ and 1/5! Holy shit[.]"

C. On or about January 16, 2014, Coatney sent **JIMMY** a text message asking **JIMMY** to "stop by the office sometime" because Biggs had "brought some more stuff for [**JIMMY**] to work with."

D. On or about January 20, 2014, **JIMMY** texted Coatney that he had a "189 acre commitment" at $600.00 per acre that was "Ok'd by [Biggs]."

E. On or about January 20, 2014, **BLAINE** emailed Individual 1 that "[t]he P.O. Box address on the FEIN [was] registered to Enercore Resources, [and] in no way traceable to anything other than that."

F. On or about January 21, 2014, **BLAINE** texted Coatney: "Guess last night was a success. Sounds like [**JIMMY**] just doubled his acreage

6

count[.]"

G.     On or about January 23, 2014, **BLAINE** sent a text message to Coatney.   **BLAINE** told Coatney that Biggs had just gotten out of a meeting at Continental.   **BLAINE** instructed Coatney: "Forward from [Biggs] . . . [d]on't take any leases north of 7N townships"—presumably because Continental was not interested in purchasing those leases.

H.     On or about February 10, 2014, **BLAINE** texted **JIMMY** and Coatney that Unindicted Coconspirator had "landed that big deal."   Coatney responded to **BLAINE** and **JIMMY**:   "It's all good as long as we are getting it in hand.   'Team effort.'"     **JIMMY** added: "Glad she's [Unindicted Coconspirator's] leasing for us."

I.     On or about February 12, 2014, **JIMMY** texted **BLAINE** and Coatney and asked if they could "scan and email [him] the new map" that the coconspirators had acquired through Biggs.   **BLAINE** responded that the map was "big," but agreed that he would make a copy for **JIMMY**.

J.     On or about February 21, 2014, Unindicted Coconspirator texted Coatney and complained about working with **BLAINE** and **JIMMY**. Unindicted Coconspirator wrote: "Hey!   It's [Unindicted Coconspirator].   I can't deal with [**BLAINE**] and [**JIMMY**], so I will give you my laptop and

7

passwords to everything. This whole thing is the most ridiculous shit show I've ever seen . . ." Unindicted Coconspirator further told Coatney, "I just wanted to help and if I'm not helping I'm not going to take time away from [my son]. . . . I was just trying to make things easier for you and [**BLAINE**]. . . ."

K.     On or about February 22, 2014, **BLAINE** texted Coatney that he had "[g]ot [Unindicted Coconspirator] back on board" and that he (**BLAINE**) and Unindicted Coconspirator had "just spent 30 minutes or so updating [the] spreadsheet."

L.     On or about March 2, 2014, **BLAINE** texted Coatney that "[Unindicted Coconspirator] [was] updating the spreadsheet and getting all the files together . . . ."

M.     On or about March 5, 2014, **BLAINE** forwarded Coatney and Individual 1 an email, originally drafted by Coatney, that provided instructions for marketing an Enercore leasehold package that Continental wanted to buy.

N.     On or about March 6, 2014, **BLAINE** texted Coatney about a dry run of their scheme to re-sell leases acquired with Continental's proprietary information. **BLAINE** wrote: "The spreadsheet attached to the test email is the old spreadsheet . . . the author is still listed as [Unindicted

8

Coconspirator].   Let's take care of this, eliminate the old spreadsheet . . . ."

O.      On or about March 6, 2014, **BLAINE** texted **JIMMY** and Coatney that he was sending wire transfers from Prime Bank because "too many people" at Bank of Oklahoma knew who he (**BLAINE**) was.

P.      On or about April 3, 2014, **BLAINE** texted Individual 1 and boasted about how much money he had made selling leases improperly acquired using Continental's confidential information.   **BLAINE** wrote, "CLR.  $94,600.00 in profit today.   *stands up, flexes in mirror, and says 'you a bad mother fucker' to self[.]"

Q.      On or about April 22, 2014, **BLAINE** sent Coatney a screenshot of Enercore's bank account following a money transfer from Continental.   That same day, **BLAINE** texted Individual 1 that "there [was] still $1.5 mil coming too[.]"

R.      On or about April 28, 2014, **JIMMY** texted **BLAINE** and Coatney: "Will one of you please tell me a group of three or four sections to start doing research on for the next deal . . . ?"

S.      On or about April 29, 2014, Coatney texted **BLAINE** and **JIMMY** a photograph of a map detailing where Continental planned to acquire and lease minerals.

T.     On or about May 8, 2014, Coatney texted Individual 1 and suggested that Coatney pretend to be Individual 1 on a call with potential leasehold package buyers, and later did so.

U.     On or about May 12, 2014, **JIMMY** texted **BLAINE** and Coatney that the "[n]ew company name [was] Paramount Energy Resources, LLC"—in other words, the coconspirators would now acquire minerals and leases through Paramount, not Enercore, to avoid detection by Continental.

V.     On or about May 18, 2014, **BLAINE** texted Biggs and Coatney and asked:  "You guys want to meet this afternoon or evening for an hour or so and get organized?"   **BLAINE** followed up later, explaining that Biggs was playing golf, so they would meet the following day.

W.     On or about May 22, 2014, Coatney sent a text message to **JIMMY** and asked him to periodically check the Enercore email account over the weekend, because Coatney would be out of town.   **JIMMY** responded:  "Sure will."

X.     On or about May 28, 2014, Coatney texted Individual 1 and asked Individual 1 to send him (Coatney) documents from Enercore's email address.

Y.     On or about August 29, 2014, **BLAINE** sent Coatney a screenshot from Enercore's bank account that showed a transfer of $1,600,000.00 from

10

Continental.

Z.     On or about September 16, 2014, Coatney texted **JIMMY** and asked **JIMMY** about the new name of the entity through which the coconspirators would acquire leaseholds.     **JIMMY** responded:     "Charger Resources, LLC."     Soon thereafter, the coconspirators began acquiring leaseholds with Continental's proprietary information through Charger, not Enercore and/or Paramount.

AA.   On or about the following dates, Coatney received the following payments from bank accounts associated with the conspiracy to defraud Continental:

| Approximate Date of Payment | Amount |
|---|---|
| April 22, 2014 | $5,000.00 |
| April 22, 2014 | $5,000.00 |
| November 10, 2015 | $2,000.00 |

BB.   On or about November 14, 2014, **JIMMY** sent a text message to Coatney explaining that the ownership report for the "jack fork" leases was "very long," so Biggs had not printed it.

CC.   On or about November 25, 2014, **JIMMY** texted Coatney and

11

asked Coatney: "Will you text me a picture of the account and routing number on the Charger check—need it to complete [a] wire transfer from Ener[c]ore to Charger[.]"

DD.   On or about December 13, 2014, Coatney sent a group text message to **BLAINE**, **JIMMY**, and Biggs about a well that Continental planned to drill.   Coatney asked: "[Biggs] this is your call.   How good will that well be?"

EE.   On or about December 14, 2014, **BLAINE** texted Biggs and Coatney: "Ok, find out everything you can on the CLR well.   When we could expect payments to start coming in, etc[.]"

FF.   On or about December 28, 2014, **BLAINE** texted Coatney and suggested that they "delay filing taxes until [September] 2015" and "prepay like 100k to avoid big interest charges and look honest."

GG.   On or about January 21, 2015, Biggs texted **BLAINE** and Coatney and asked that they "have an executive meeting on what to do with some of [the] acreage" that they had acquired.

HH.   On or about August 2, 2016, **BLAINE** emailed Individual 1 and assured Individual 1 that Individual 1 could be "done forever" with the scheme to defraud Continental as soon as **BLAINE** switched banks.

12

II.     On or about November 15, 2016, Individual 1 signed a check made payable to "Enercore Resources" from Enercore's Bank of Oklahoma bank account, which was deposited into a new Enercore bank account at Prosperity Bank that same day.

JJ.     On or about the following dates, Biggs made the following cash deposits, which were portions of the kickback payments that he received from **BLAINE**:

| Approximate Date of Deposit | Amount |
|---|---|
| February 4, 2016 | $50,000.00 |
| March 30, 2016 | $50,000.00 |
| January 26, 2017 | $25,000.00 |
| March 15, 2017 | $25,000.00 |

LL.     On or about October 25, 2018, **BLAINE** signed a check made payable to "Enercore Resources, LLC" for the purpose of "mov[ing] money to Bank7," which he deposited in a new Enercore Bank7 bank account—account number xxxxxx5173—that same day.

MM.     In addition to profits yielded from re-selling or re-leasing land and minerals to Continental and others, the coconspirators maintained Overriding

Royalty Interests ("ORRIs") in the leases that they acquired with the insider information that Biggs provided and sold to Continental. As a result, the coconspirators continued to receive ORRI payments from Continental— usually on a monthly basis—through June 2020.

OO. The coconspirators also committed the acts described in paragraphs 13-20, which the Federal Grand Jury incorporates by reference.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO - EIGHT
### (Honest Services Wire Fraud)

11. The Federal Grand Jury Incorporates paragraphs 1-10 by reference.

12. It was part of the scheme to defraud that **BLAINE**, **JIMMY**, Biggs, Coatney, and others committed the acts alleged in paragraphs 9 and 10, which the Federal Grand Jury incorporates by reference.

13. On or about March 20, 2014, Biggs, on behalf of Continental, issued an offer to purchase an assignment from Enercore for all of Enercore's right, title, and interest in certain lands that Enercore had acquired with proprietary information that Biggs provided **BLAINE**, **JIMMY**, and others about Continental's drilling and leasing plans. Continental ultimately agreed to

14

accept most, but not all, of the acreage that Biggs initially offered to purchase on behalf of Continental.

14.   On or about April 22, 2014, Continental wired $3,462,533.32 to an Enercore bank account to pay for the assignment that was ultimately agreed upon ("Transaction 1").

15.   On or about July 24, 2014, Biggs, on behalf of Continental, issued a second written offer to purchase an assignment from Enercore for all of Enercore's right, title, and interest in additional lands that Enercore had acquired with proprietary information that Biggs provided **BLAINE**, **JIMMY**, and others about Continental's drilling and leasing plans.   Once again, Continental ultimately agreed to accept most, but not all, of the acreage that Biggs initially offered to purchase on behalf of Continental.

16.   On or about August 29, 2014, Continental wired $1,621,684.00 to an Enercore bank account to pay for this second assignment ("Transaction 2").

17.   Enercore maintained ORRIs in the lands that it assigned to Continental through Transactions 1 and 2.   Continental made ORRI payments to Enercore each month pursuant to Transactions 1 and 2 through June 2020.

18.   U.S. Bank National Association ("U.S. Bank") was a federally

insured financial institution founded in Cincinnati, Ohio, and headquartered in Minnesota. From at least January 2018 through at least June 2020, Continental maintained a U.S. Bank "Distribution Account," account number xxxxx5038 ("The Distribution Account").

19. Bank7 was an Oklahoma-based community bank with locations throughout Oklahoma, Kansas, and Texas. From at least October 2018 through at least November 2020, Enercore maintained a Bank7 checking account, account number xxxxxx5173 ("the Bank7 Account").

## Executions of the Scheme

20. On or about the following dates, in the Western District of Oklahoma and elsewhere,

-----------------------------------**BLAINE DYER and**
                        **JAMES ("JIMMY") DYER**,-----------------------

for the purpose of executing the above-described scheme to defraud in a material manner, knowingly caused signals to be transmitted by means of wire communications in interstate commerce. In particular, **BLAINE**, **JIMMY**, and others caused interstate wire communications to transmit ORRI payments pertaining to Transactions 1 and 2 from Continental's Distribution Account to Enercore's Bank7 account as follows:

16

| Count | Approx. Date of Receipt by Enercore | Amount |
|---|---|---|
| 2 | November 13, 2018 | $274.29 |
| 3 | December 11, 2018 | $282.01 |
| 4 | March 13, 2019 | $332.56 |
| 5 | April 3, 2019 | $251.78 |
| 6 | June 7, 2019 | $195.78 |
| 7 | February 6, 2020 | $149.90 |
| 8 | March 31, 2020 | $109.26 |

All in violation of Title 18, United States Code, Sections 1346 and 1343.

## False Statements to Mortgage Lending Businesses

21.    On or about April 20, 2020, Continental filed a civil law suit against **BLAINE**, **JIMMY**, Biggs, Coatney, Individual 1, and others regarding the above-described conduct.

22.    In the months that followed, **BLAINE** retained a criminal defense attorney, who communicated with the United States Attorney's Office regarding, among other things, the fact that **BLAINE** would self-surrender to avoid arrest if and when he was criminally charged.

17

23. On or about October 21, 2021, **BLAINE** obtained two mortgages to fund the purchase of property valued at approximately $2,200,00.00 in Edmond, Oklahoma. **BLAINE** signed a loan agreement with Chemtov Mortgage Group Corp. ("Chemtov"), a mortgage lending company based in Miami, Florida, for a principal amount of $1,200,000.00. He signed a second, separate promissory note for a principal sum of $600,000.00 with Doo, LLC ("Doo"), an Oklahoma-based lender. **BLAINE** executed a Mortgage and Security Agreement naming Chemtov as Mortgagee, and a Second Real Estate Mortgage naming Doo as Lender, that same day.

## COUNT 9
### (False Statement on a Loan Application)

24. The Federal Grand Jury incorporates paragraphs 1, 3, 7-10, and 21-23 by reference.

25. On or about October 21, 2021, in the Western District of Oklahoma and elsewhere,

-----------------------------------------**BLAINE DYER**------------------------------------------

knowingly made a false statement for the purpose of influencing the action of Chemtov Mortgage Group Corp., a mortgage lending business. In particular, **BLAINE** represented that there was no claim, action, suit, or proceeding

pending, threatened, or reasonably anticipated before any court, whether state or federal, that would materially adversely affect **BLAINE**'s financial condition, operations, properties, or business, or **BLAINE**'s ability to perform his loan obligations, well knowing that he (**BLAINE**) was a named co-defendant in a state civil lawsuit, and the target of a federal criminal investigation.

All in violation of Title 18, United States Code, Section 1014.

## COUNT 10
### (False Statement on a Promissory Note)

26.    The Federal Grand Jury incorporates paragraphs 1, 3, 7-10, and 21-23 by reference.

27.    On or about October 21, 2021, in the Western District of Oklahoma

----------------------------------------**BLAINE DYER**----------------------------------------

knowingly made a false statement for the purpose of influencing the action of Doo, LLC, a mortgage lending business.   In particular, **BLAINE** represented that there were no pending or threatened legal or arbitral proceedings against him which might materially affect his financial condition, well knowing that he was a named co-defendant in a state civil lawsuit, and the target of a federal

19

criminal investigation.

All in violation of Title 18, United States Code, Section 1014.

## FORFEITURE

The allegations contained in this Indictment are hereby re-alleged and incorporated for the purpose of alleging forfeiture.

Upon conviction of any of the offenses alleged in Counts 1 through 10 of this Indictment, Defendant **BLAINE DYER** shall forfeit to the United States any and all property constituting or derived from proceeds obtained directly or indirectly as a result of the said offenses, including but not limited to a personal money judgment in the amount of the proceeds obtained as a result of the offenses.

Upon conviction of any of the offenses alleged in Counts 1 through 8 of this Indictment, Defendant **JIMMY DYER** shall forfeit to the United States any and all property constituting or derived from proceeds obtained directly or indirectly as a result of the said offenses, including but not limited to a personal money judgment in the amount of the proceeds obtained as a result of the offenses.

Pursuant to Title 21, United States Code, Section 853(p), as adopted by Title 28, United States Code, Section 2461(c), the defendants shall forfeit

20

substitute property, up to the value of the property described above if, by any act or omission of defendant, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property that cannot be subdivided without difficulty.

A TRUE BILL:

FOREPERSON OF THE GRAND JURY

ROBERT J. TROESTER
United States Attorney

JULIA E. BARRY
BRANDON HALE
Assistant United States Attorneys

21