# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>  )<br>  Plaintiff, )<br>  )<br>v.   )<br>  )<br>BLAINE DYER and JAMES ("JIMMY") )<br>DYER,   )<br>  )<br>  Defendants. ) | Case No. CR-22-00209-JD |

## **ORDER**

Before the Court are several motions involving the break-in of Defendant Blaine Dyer's commercial office building[1] in April 2021 by persons associated with Continental Resources, Inc. ("Continental"), which was the subject of a March 8, 2022 Sanction Order in a separate civil lawsuit pending in Oklahoma County District Court. *See Continental Resources, Inc. v. Blaine Dyer, et al.*, Okla. Cnty. Case No. CJ-2020-1920, Order dated Mar. 8, 2022, and Feb. 9, 2022 docket text entry, of which the Court takes judicial notice.

The first is Defendant James Dyer's Motion for Order for a Special Master or Magistrate Judge to Conduct Review of Stolen Privileged Documents [Doc. No. 68], in

---

[1] It is the Court's understanding that Perpetual Production, LLC ("Perpetual"), was the tenant at the time of the break-in and that the property was listed for sale; that Perpetual, as a result, initiated a separate lawsuit against Continental, Eric Eissenstat, Samuel Macaluso, and others; and that the lawsuit is pending in Oklahoma County District Court. *See Perpetual Production, LLC v. Continental Resources, Inc., et al.*, Case No. CJ-2021-2279.

which Defendant Blaine Dyer joins in, adopts, and incorporates on his behalf [Doc. No. 99].[2] The United States filed a response in opposition [Doc. No. 85].[3]

The second is Defendant Blaine Dyer's Amended/Corrected Motion to Dismiss for Outrageous Government Misconduct [Doc. No. 103], which Defendant James Dyer joins in and supplements through his own motion [Doc. No. 124].[4] The United States filed a response in opposition [Doc. No. 127]. The Court takes these motions up together.

Defendants make serious accusations of unethical, bad faith conduct by the government's attorneys "including farming out its investigation to" Continental, the primary victim in this case, enlisting Continental "as its agent to investigate [Defendants]" on the government's behalf, orchestrating a break-in of Blaine Dyer's commercial property, and using "stolen privileged documents" in discovery and to

---

[2] The United States objects to Blaine Dyer joining this motion [Doc. No. 119 at 4] and asserts that Blaine Dyer "cannot summarily join . . . without first identifying the purported privileged documents at issue" and explaining how he "holds the privilege." To the extent this Order turns on that issue, i.e., failure to identify any specific communication that would be subject to the attorney-client privilege, the Court agrees, but otherwise the Court permits Blaine Dyer to join in the request relief. As set forth below, however, the Court denies the requested relief as to both Defendants on all arguments.

[3] Any citations by the Court in this Order to documents found on CM/ECF will be to the page numbering across the top.

[4] The United States asserts that James Dyer has no standing because the commercial property belongs to Blaine Dyer, but that James Dyer should also be precluded from referencing the break-in at trial. [Doc. No. 127 at 1 n.1]. Without taking up the merits of the standing objections, the Court will address the merits of the issues raised in Defendants' motions and note that the government has preserved the standing issue for any appeal.

prosecute this case. The Court takes these claims very seriously and has given them careful attention.

The government has responded in strong opposition to the motions, arguing that the allegations are baseless, completely unsubstantiated, and do not warrant dismissal of the case or a court-ordered review of discovery. The government asks the Court to enter an order barring Defendants from referencing Continental's break-in at trial.

Defendants do not request an evidentiary hearing to substantiate their allegations of prosecutorial misconduct, and after full consideration of the allegations made in this case, the Court finds that the motions should be denied without a hearing for the reasons discussed herein. Upon close examination of the supporting factual materials submitted with the motions and in the government's responses, the Court finds that Defendants' claims do not appear to be well grounded in fact and do not warrant further investigation at this point.

I. **BACKGROUND**

In May 2020, Blaine Dyer sued his former employee, Matthew Golladay, and Golladay's consulting firm in Oklahoma County District Court for various causes of action, including breach of contract, breach of fiduciary duty, fraud, and unjust enrichment. *See* Okla. Cnty. Case No. CJ-2020-2469. Blaine Dyer alleges in the state court petition that Golladay "misappropriated a significant amount of money from [Dyer] by improperly transferring funds and other benefits." *See* Pet. at ¶ 14 in Okla. Cnty. Case

No. CJ-2020-2469.[5] In his answer to the petition, Golladay admits that he was hired as the chief financial officer of Blaine Dyer's business entities, and that through this position he had access and the ability to transfer funds from Dyer's bank accounts, but he denies that he misappropriated funds or made unauthorized transfers. [Doc. No. 103-2 ¶¶ 25–27]. In his counterclaim for breach of contract, Golladay asserts that Blaine Dyer accused him of embezzlement and other illegal conduct, but that such accusations were "nothing short of a shakedown." *See id.* at ¶ 17. "Fed up with the coercive and domineering tactics of [Blaine] Dyer," Golladay asserts he "provided information, including the allegations of embezzlement, to government authorities, so the agencies could investigate, if so inclined, the unfounded accusations of [Blaine] Dyer." *See id.* at ¶ 20. Golladay indicates that he also provided Continental with information regarding Blaine Dyer, Justin Biggs, Coy Morgan, and Robert G. Dyer, and related entities. *See id.* at ¶ 22. Blaine Dyer's civil petition against Golladay does not reference "stolen documents." Nor does Golladay's answer for that matter. Nor is there any indication suggesting that the information Golladay provided Continental consisted of "stolen documents." Additionally, the civil filings do not indicate that the "agencies" Golladay provided information to include the FBI or the United States Attorney's Office.

---

[5] The Court takes judicial notice of the docket report and filings in this state-court proceeding and any other state court proceeding listed in this Order.

In April 2021, Sam Macaluso,[6] a former FBI agent and private investigator for Continental, obtained entry into Blaine Dyer's commercial property housing Perpetual, a small oil and gas company. At the time, the property was listed for sale and Macaluso entered under the guise of a St. Louis buyer and investor. A separate civil lawsuit in Oklahoma County involving Continental, Blaine Dyer, and James Dyer was also underway. According to Blaine Dyer's motion, the real estate agent who showed Macaluso the property was Philip Churchill, who was related to a vice president at Continental and was also the real estate agent for Continental's then-general counsel, Eric Eissenstat. *See* [Doc. No. 103 at 12].

Blaine Dyer asserts that Macaluso stole paperwork and rummaged through Perpetual's confidential information, including maps containing buy areas, pricing, and other proprietary information, and took "at least 19 photographs of Perpetual's information." *See id.* at 13. Following the break-in, counsel for Continental, John Russell[7] and Nick Merkley, contacted Clayton Johnson, who was the FBI case agent assigned to the Dyer criminal investigation in April 2021. Russell and Merkley "represented that, because [Blaine Dyer's commercial office] building was for sale, someone affiliated with Continental had walked through it" and that it might house "maps, letters, and other information pertaining to Continental." [Doc. No. 103-1 at 2].

---

[6] Defendants assert that Macaluso is the former chief of the Oklahoma City FBI Field Office and now head of security at Continental.

[7] Defendants assert that John Russell is a former United States Attorney for the Northern District of Oklahoma.

According to government counsel, "[t]hat was the end of the matter," and the FBI "neither obtained nor reviewed any of the information . . . nor . . . engaged in subsequent communications with counsel for Continental about it." *See id.* Julia Barry, the lead prosecutor, communicated such to Blaine Dyer's then criminal counsel, Joe White, by letter on May 12, 2021. *See id.* Barry also represented to White that neither the FBI nor the United States Attorney's Office had knowledge of any "alleged ruse" to enter Blaine Dyer's commercial property prior to reviewing White's letter dated May 6, 2021. *See id.* at 2–3. On May 17, 2021, Barry emailed Merkley and Russell advising them that neither the United States Attorney's Office nor the FBI "wish[ed] to review or discuss any information that you may have obtained on or about April 19, 2021, or on or about April 20, 2021, from the commercial property of Blaine Dyer." [Doc. No. 127-1 at 2].[8]

In the civil case, the break-in was at the center of a sanctions order, in which Judge Anthony Bonner ruled that Continental was "precluded from utilizing any and all evidence and testimony from witnesses stemming from and related to th[e] April 19, 2021 showing of Defendant Blaine Dyer's property." *See* Okla. Cnty. Case No. CJ-2020-1920 at Order at 6 (Mar. 7, 2022).

Essentially because of Macaluso and Russell's former government employment, and because a large portion of the discovery is marked with an indicator that it was received from GableGotwals, the law firm representing Continental in the civil case,

---

[8] Merkley also stated in a letter to White that "[a]s Ms. Barry noted in her letter responding to you, Continental has not shared these photographs or information with the U.S. Attorney's Office or the FBI." [Doc. No. 68-3 at 21].

Defendants assert that the government and Continental have been colluding against them and that such discovery must include stolen documents. Defendants also reference a comment made by Oklahoma County District Judge Susan Stallings to Merkley during a proceeding in the civil case involving a motion to stay by the Dyer defendants. Only excerpts of the proceeding are provided by Defendants. [Doc. No. 103-3]. Judge Stallings asks Merkley if Continental is "birddogging for the U.S. Attorney's Office." *See id.* at 6. Merkley's response is not included in the attached transcript, nor can the Court tell from the portions of the transcript attached what prompted Judge Stallings' question.[9]

The government explains in its responses to this Court why some of the discovery bears a GableGotwals' bates stamp—and that is because the grand jury subpoenaed a large volume of material from Continental, the corporate victim in this case, and pursuant to that proper legal process, Continental was assisted by its outside counsel in responding to the subpoena. There is nothing improper or nefarious about that process. Additionally, Defendants' assertion that Continental has been acting as a government agent in this case appears to be premised solely on Russell and Macaluso's former government positions and lacks any factual or evidentiary support. To date, Defendants have not pointed to any specific document in the possession of the government that was allegedly stolen by Continental, Macaluso, or Golladay.

---

[9] Blaine Dyer does include in his motion at page 10 what appears to be an excerpt of Merkley's response to Judge Stallings, and Merkley denies assisting the government in its criminal investigation of the Dyers. [Doc. No. 103 at 10]. It is not clear whether this is Merkley's entire response.

## II.  DISCUSSION

**A.  The government's conduct in investigating and prosecuting this case does not meet the standard for outrageous conduct, and therefore, does not violate Defendants' due process rights.**

Defendants assert that the government's conduct during its investigation of this case is so outrageous that it violates Defendants' due process rights, and as such, the charges against them should be dismissed. "When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct." *United States v. Mosley*, 965 F.2d 906, 908 (10th Cir. 1992). A defendant's challenge to such conduct "is predicated on the Due Process Clause of the Fifth Amendment to the United States Constitution." *Id.* at 908–09. The focus is on the government's behavior. *See id.* (citing *United States v. Gamble*, 737 F.2d 853, 858 (10th Cir. 1984)).

The defense of outrageous conduct was first recognized in *United States v. Russell*, 411 U.S. 423, 431–32 (1973). There, the Supreme Court explained that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," but that the instant case was "not of that breed." *See id.* "Notwithstanding the lack of a clear holding on outrageous conduct by the Supreme Court, most of the circuits, including [the Tenth Circuit], have recognized the viability of the outrageous conduct defense." *Mosley*, 965 F.2d at 909 (collecting cases). However, no court has attached a precise definition as to the

requirements of an outrageous conduct defense. *See id.* at 910. Instead, "the inquiry appears to revolve around the totality of the circumstances in any given case." *Id.*

The Tenth Circuit has made it "clear that this is an extraordinary defense reserved for only the most egregious circumstances." *Id.* "[T]o prevail, the defendant must show that the challenged conduct violates notions of 'fundamental fairness' and is 'shocking to the universal sense of justice.'" *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994) (quoting *United States v. Harris*, 997 F.2d 812, 816 (10th Cir. 1993)). As articulated by the Tenth Circuit, "a defendant asserting the outrageous governmental conduct defense bears the burden of proving either '(1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime.'" *United States v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013) (quoting *Pedraza*, 27 F.3d at 1521). In *Dyke*, the Tenth Circuit declined to decide whether the outrageous conduct defense was still viable, but it noted it had never been applied by it to strike down a conviction. *Id*. at 1287–88. In any event, it is unnecessary for the Court to determine whether the defense of outrageous government conduct is available to Defendants in the Tenth Circuit because no such conduct has occurred in the instant case. *See, e.g.*, *United States v. Varnell*, Case No. 20-6040, 2021 WL 5875718, at *3 (10th Cir. Dec. 13, 2021) (unpublished) (citing *Dyke*, 718 F.3d at 1287–88); *see also United States v. Lacey*, 86 F.3d 956, 964 (10th Cir. 1996) (explaining that the lack of Tenth Circuit decisions holding that governmental conduct constitutes outrageous conduct "bears testament to its narrow scope").

Although "there is a point at which excessive government zeal may warrant judicial intervention . . . courts will not fine tune conduct of law enforcement officials that does not offend the universal sense of justice." *See Lacey*, 86 F.3d at 964 (citations omitted). Simply put, the government's conduct in this case does not meet that standard nor has the defense pointed to any cases that would support warranting judicial intervention in this case. At best, Defendants' claims are unsupported and based on pure speculation. The government did not "engineer[] and direct[] the criminal enterprise from start to finish." *Dyke*, 718 F.3d at 1288 (citation omitted). Nor did it have any "role in inducing [Defendants] to become involved in the crime." *Pedraza*, 27 F.3d at 1522 (citations omitted).

Further, under the Crime Victims' Rights Act, Continental, as the alleged victim of a crime, has the "reasonable right to confer with the attorney for the Government in the case." *See* 18 U.S.C. § 3771(a)(5). And the government must use "their best efforts to see that [Continental is] notified of, and accorded, the rights described" therein. *Id.* § 3771(c)(1). Defendants have provided no evidence that Continental, as the alleged primary victim, has tainted or is driving the government's criminal investigation, and the government has denied it and submitted correspondence indicating the exact opposite.

Additionally, the representations by government counsel included in their responses to Defendants' motions on this issue are made as officers of the Court and consistent with their professional and ethical obligations. *See* LCvR83.6(b) (explaining that the Oklahoma Rules of Professional Conduct govern attorney conduct in this Court);

10

LCrR57.2 (explaining LCvR83.6 is applicable to the local criminal rules); *see also* Okla. Rule of Professional Conduct 3.3 (discussing the lawyers' obligations of candor toward the court). Thus, the Court is satisfied that Defendants' claims of government misconduct remain unsubstantiated.

**B.      A court-ordered review of documents is not warranted.**

At most, Defendants have raised vague, unsubstantiated allegations that the government's discovery file may contain attorney-client privileged communications. However, they provide no description of the potentially privileged material or a list of counsel whose communications should be subject to review. The applicability of the attorney-client privilege is "narrowly construed," *In re Foster*, 188 F.3d 1259, 1264 (10th Cir. 1999), and "[t]he party seeking to assert the attorney-client privilege has the burden of establishing its applicability." *In re Grand Jury Subpoenas*, 144 F.3d 653, 658 (10th Cir. 1998) (citing *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550 (10th Cir. 1995)). A party does not meet its burden "'by making a blanket claim,'" but rather by bearing "'the burden as to specific questions or documents.'" *In re Grand Jury Proc.*, 616 F.3d 1172, 1183 (10th Cir. 2010) (quoting *In re Foster*, 188 F.3d at 1264). Simply asserting that Golladay or Macaluso stole privileged documents does not meet this burden. Defendants improperly seek blanket protection without identifying any specific communications that are arguably covered by the attorney-client privilege.

In one case cited by the defense, *United States v. Black*, the District Court of Kansas appointed a special master after allegations arose that the government had

obtained and disseminated in discovery privileged audio and video recordings of communications between detention center inmates and their attorneys. *See Black*, Case No. 16-20032-JAR, 2016 WL 6967120, at *1 (D. Kan. Nov. 29, 2016). There, specific communications were identified that obviously hinged on confidential communications between attorneys and their incarcerated clients. That situation is not present here.

There is no controlling law regarding the appointment of a special master under the Federal Rules of Criminal Procedure. Thus, Defendants argue for the appointment of a special master or magistrate judge under Federal Rule of Civil Procedure 53. Under that rule, "a court *may* appoint a master *only to*: (A) perform duties consented to by the parties; (B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by: (i) some exceptional condition; or (ii) the need to perform an accounting or resolve a difficult computation of damages; or (C) address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge . . . ." Fed. R. Civ. P. 53(a) (emphasis added). Here, the government does not consent to the appointment, nor have Defendants identified exceptional conditions warranting appointment of a special master. Defendants have had the discovery for months and have had plenty of opportunity to identify at least one document in discovery that is privileged or contains legal advice, and they have not done so. To appoint a special master, over the government's objection, without any basis to support the need for such appointment appears contrary to the rule. And the Court will

not take up the judiciary's limited resources to embark on a fishing expedition. It might be different if the defense had raised legitimate concerns grounded in evidentiary support.

**C.      The Court agrees with the government that any reference at trial to Continental's break-in of Blaine Dyer's commercial office building is inappropriate and not relevant.**

The instant criminal case will not be used to re-litigate issues from the pending civil case in state court. Here, there has been no showing by Defendants that testimony and exhibits in this regard are material to any central issue in the case or any element of the offenses charged. Even if such evidence were relevant, its probative value is substantially outweighed by a danger of unfair prejudice to the government, in that it would in effect tie the government to misconduct that is speculative and is not supported by the submissions; it also has the danger of confusing the issues, misleading the jury, undue delay, and wasting time. *See* Fed. R. Evid. 403.

**III.   CONCLUSION**

Based on the parties' submissions and the relevant law, the Court DENIES Defendant James Dyer's Motion for Order for a Special Master or Magistrate Judge to Conduct Review of Stolen Privileged Documents [Doc. No. 68], in which Defendant Blaine Dyer joins in, adopts, and incorporates on his behalf [Doc. No. 99].[10] The Court also DENIES Defendant Blaine Dyer's Amended/Corrected Motion to Dismiss for

---

[10] Blaine Dyer's Notice of Motion and Motion for Joinder in Motions of Co-Defendant James Dyer [Doc. No. 99] is granted to the limited extent that Blaine Dyer is allowed to join in James Dyer's motion at Doc. No. 68, but it is otherwise denied on the merits as to that issue. The Court will rule on the other joinder aspects as they arise with each individual motion by separate order.

13

Outrageous Government Misconduct [Doc. No. 103] and Defendant James Dyer's Motion for Joinder and Brief to Co-Defendant Blaine Dyer's Motion to Dismiss for Government Misconduct [Doc. No. 124].[11]

IT IS SO ORDERED this 12th day of February 2023.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

---

[11] James Dyer's Motion for Joinder [Doc. No. 124] is granted only to the extent that he is allowed to join in Blaine Dyer's motion [Doc. No. 103]. Again, the Court did not address the merits of the government's standing objection given that it denied the motion.