**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-22-00209-JD |
| | ) | |
| BLAINE DYER and JAMES ("JIMMY") | ) | |
| DYER, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Before the Court is Defendant James Dyer's Motion to Strike and Challenge Jury Array, Jury Panel(s), and Dismiss Indictment [Doc. No. 1] for Improper Selection of Grand and Petit Jurors ("Motion") [Doc. No. 61]. Defendant Blaine Dyer joins in, adopts, and incorporates on his behalf the Motion [Doc. No. 99].[1] The government responded in opposition [Doc. No. 78]. The Court granted Defendants' Motion for Discovery of Jury Records [Doc. No. 60], *see* Order [Doc. No. 139], and the Clerk of Court filed a sealed Response [Doc. No. 141], attaching materials relevant to the instant motion. As permitted by the Court's Order, Defendants filed a joint supplemental brief [Doc. No. 153].

At a status conference held after the *James* hearing concluded on February 3, 2023, counsel for James Dyer explained that, due to time constraints and technical difficulties, he was unable to file the supplemental brief with its referenced attachments

---

[1] The United States does not object to Blaine Dyer joining the Motion [Doc. No. 119] at 5. The parties also advised that the filing of the Superseding Indictment [Doc. No. 84] does not impact the challenge raised in the Motion to Strike and Challenge Jury Array, Jury Panel(s), and Dismiss Indictment. [Doc. No. 89].

before the deadline. He thus made an oral motion seeking leave to file a supplement with attachments out of time. *See* Minute [Doc. No. 158]. The government did not oppose, and the Court granted him leave. *Id.* Rather than simply refiling the supplemental brief with the attachments, counsel filed a different brief, albeit one raising some of the same arguments, with two affidavits and a map. [Doc. No. 156]. This supplemental brief expands on a newly asserted claim, which was first raised less than two weeks before the Court was set to select a jury in this case. The Court then permitted the government to respond to the supplemental brief, and the government filed its response to the new claim. [Doc. No. 167].

Citing the Jury Selection and Service Act, 28 U.S.C. § 1861 et seq. ("JSSA"), and the Sixth Amendment to the United States Constitution, Defendants (1) request that the jury venire for grand and petit juries in this case include individuals outside of the Oklahoma City Metropolitan Area and (2) move to dismiss the Indictment [Doc. No. 1] and Superseding Indictment [Doc. No. 84]. Defendants do not request an evidentiary hearing on this Motion.

## I.    **BACKGROUND**

Defendants Blaine and James Dyer are charged in an Indictment [Doc. No. 1] with offenses arising out of an alleged scheme, lasting from around November or December 2013 until around June 2020, to defraud Continental Resources, Inc. ("Continental") of land and mineral lease acquisitions by using Continental's confidential business information involving future drilling and leasing plans. The government later filed a Superseding Indictment [Doc. No. 84] that added a new count against Blaine Dyer but

did not substantively alter the other charges set forth in the Indictment. The Superseding Indictment includes against Blaine and James Dyer one count for Conspiracy to Commit Honest Services Wire Fraud, in violation of 18 U.S.C. § 1349, and seven counts of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1346 and 1343. Blaine Dyer is solely and additionally charged in three counts of making a false statement on a loan application, promissory note, or commercial guaranty, in violation of 18 U.S.C. § 1014.

By the instant Motion, Defendants challenge the Court's jury selection procedures for grand and petit juries. They claim that the Court's jury selection plan constitutes "unconstitutional 'gerrymandering' of jurors from only certain counties." *See* Motion at 1.[2]

The Court's jury selection plan is set forth in two general orders: G.O. 09-02 (filed Mar. 4, 2009) and G.O. 14-5 (filed June 16, 2014). The process is summarized by the Clerk in her Response to the Court's Order, [Doc. No. 141] at ¶¶ 1–10, and the Court incorporates that summary into this Order. Most relevant for purposes of the instant Motion is (a) how the Court populates jury wheels and (b) which jury wheels are used for random selection of prospective grand and petit jurors.

The Court populates Master Jury Wheels based on geographic location. As explained by the Clerk, the Court divides the Western District of Oklahoma into four divisions for purposes of jury selection:

---

[2] Unless otherwise noted, the Court uses ECF page numbering.

- Oklahoma City Division, which includes Blaine, Canadian, Cleveland, Garvin, Grady, Kingfisher, Lincoln, Logan, McClain, Oklahoma, and Pottawatomie Counties;

- Enid-Ponca City Division, which includes Alfalfa, Garfield, Grant, Kay, Noble, and Payne Counties;

- Lawton-Mangum Division, which includes Beckham, Caddo, Comanche, Cotton, Greer, Harmon, Jackson, Jefferson, Kiowa, Stephens, Tillman, and Washita Counties; and

- Woodward Division, which includes Beaver, Cimarron, Custer, Dewey, Ellis, Harper, Major, Roger Mills, Texas, Woods, and Woodward Counties.

*Id.* at ¶¶ 1–5; G.O. 09-02 at ¶ (A)(1)–(4). Each division has a separate Master Jury Wheel. *Id.*[3]

For selection of prospective grand jurors, the Court's jury selection plan provides that individuals shall be drawn randomly from each of the four Master Jury Wheels. G.O. 09-02 at ¶ (K). For selection of prospective petit jurors, the Court's plan provides that individuals shall be drawn randomly from the Master Jury Wheel of the division where the trial will be held. *Id.* at ¶ (A) ("The Court has considered parts of the district from which jurors should be selected for the places where Court is held, and finds that a designation of counties from which jurors will be drawn for each place of holding court will result in impartial trials and at the same time avoid incurring unnecessary expense and unduly burdening citizens in any part of the district with jury service.").

---

[3] The Clerk's Office mails juror qualification questionnaires to randomly chosen names from the jury wheels. *Id.* at ¶ 6; [Doc. No. 141-3]. The questionnaire form is one required by the Administrative Office of the United States Courts. While the form requires the potential juror to indicate his or her race, which includes "American Indian/Alaska Native," it does not require a potential juror to provide information regarding tribal membership.

Thus, for trials held at the William J. Holloway Jr. United States Courthouse in Oklahoma City, potential petit jurors are drawn only from the Master Jury Wheel for the Oklahoma City Division. [Doc. No. 141] at ¶ 2. For nearly three decades, almost all jury trials in this district have been held in Oklahoma City. *See United States v. Orange*, 364 F. Supp. 2d 1288, 1294 (W.D. Okla. 2005). *But see, e.g.*, W.D. Okla. Case No. CR-11-298-F [Doc. Nos. 404, 407, 409–12, 414, and 419–20] (Minutes of a jury trial held at the United States Courthouse in Lawton, Oklahoma); W.D. Okla. Case No. CIV-99-1841-L [Doc. Nos. 83–86] (same).

## II.   <u>DISCUSSION</u>

Defendants argue that these jury selection procedures violate the JSSA and their Sixth Amendment right to a jury trial, specifically their right to selection of a jury from a representative cross-section of the community. The main contention of the initial Motion was that the Court systematically excludes from jury service individuals who live outside of the Oklahoma City Division. In support of this contention, Defendants submitted an affidavit of Greg Pinegar, a resident of Woods County in Northwest Oklahoma. [Doc. No. 61-1]. After the Court granted Defendants' motion for disclosure of jury selection records, Defendants filed a Supplement [Doc. No. 156], which raised for the first time an argument that the Court's jury selection procedures wrongfully exclude members of certain federally recognized Indian Tribes with reservations or headquarters located outside of the Oklahoma City Division. In support of this new argument, Defendants submitted an affidavit of Kennis Bellmard, a tribal member and director of government relations of the Kaw Nation, an affidavit of Chadwick Smith, a tribal member and former

Principal Chief of the Cherokee Nation, and a map of tribal jurisdictions in Oklahoma. [Doc. Nos. 156-1–156-3].

Upon review of the briefing, accompanying materials, and the Clerk's Response, the Court finds that Defendants' claim under the JSSA is untimely, that their contentions regarding the Court's grand jury selection procedures are unsupported, and that Defendants' Sixth Amendment challenges to the Court's petit jury selection procedures fail on their merits.

### A. Defendants' claim under the Jury Selection and Service Act is untimely.

Defendants have not complied with the procedural requirements of the JSSA, as their claim is untimely. The Tenth Circuit has "cautioned against 'ad hoc review' of the Jury Act's procedural requirements given that the statute provides a remedy for substantial violations without a showing of prejudice." *United States v. Stein*, 985 F.3d 1254, 1262 (10th Cir. 2021) (quoting *United States v. Contreras*, 108 F.3d 1255, 1266 (10th Cir. 1997)). Thus, "[s]trict compliance with" the JSAA's "procedural requirements is essential." *Contreras*, 108 F.3d at 1266.

The JSSA requires defendants to assert their claim "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." 28 U.S.C. § 1867(a). "A defendant's failure to file a challenge within seven days after being put on notice of the allegedly deficient jury selection procedures precludes a Jury Act claim." *Stein*, 985 F.3d at 1262. When a defendant is represented by counsel with knowledge of a court's local rules and jury selection procedures, defense counsel's

knowledge is imputed to the defendant. *United States v. Green*, 435 F.3d 1265, 1269 n.2 (10th Cir. 2006) (citing *United States v. Windrix*, 405 F.3d 1146, 1157 (10th Cir. 2005)). This means a defendant represented by counsel must assert a JSSA claim within seven days from the time his attorney enters his appearance in the case. *See id.*; *Windrix*, 405 F.3d at 1156–57 (finding a JSSA claim time-barred because, given defense counsel's knowledge of local rules, the defendant could have discovered, by exercise of diligence, the grounds of his JSSA claim before he filed his motion).

Here, counsel for Defendant James Dyer entered his appearance on June 9, 2022 [Doc. No. 7], and lead counsel for Defendant Blaine Dyer entered his appearance on November 16, 2022 [Doc. No. 47].[4] Defendants waited until December 4, 2022 to file their motion for disclosure of jury selection records and until December 5, 2022 to file their JSSA claim challenging the Court's jury selection procedures. The Court's jury selection procedures are set forth in general orders, G.O. 09-02 and G.O. 14-5, that were filed well before this case. Consistent with *Windrix* and *Green*, the Court finds that Defendants "could have discovered, by the exercise of diligence" the grounds of their JSSA fair cross-section claim well before they filed their motion.[5] *See* 28 U.S.C.

---

[4] Defendant Blaine Dyer's first counsel entered his appearance on June 9, 2022. [Doc. No. 8]. Whichever date the Court uses—the date his first counsel entered or the date his most recently retained counsel entered—is inapposite because both are well beyond seven days before the date Defendants filed the JSSA claim.

[5] Defendants appear to claim that they first discovered the ground for their JSSA claim, "relying only on" G.O. 09-02 and G.O. 14-5, within seven days of filing the Motion on December 5, 2022. Supplement at 3. Defendants do not, however, explain why their retained counsel, who have practiced before this Court for several years, were

§ 1867(a). Accordingly, their JSSA claim is untimely and procedurally barred. *See infra* note 7. All that remains for resolution is Defendants' Sixth Amendment fair cross-section claims.

### B. Defendants' contentions regarding the Court's grand jury selection procedures are unsupported.

The panel of prospective jurors for the grand juries that returned indictments in this case included individuals who reside outside of the Oklahoma City Metropolitan Area. Defendants fail to read G.O. 09-02, which expressly states: "[g]rand jurors shall be drawn proportionately from *each* of the four divisions in the qualified jury wheel as ordered by the Court by a purely randomized process through a properly programmed electronic data processing system." ¶ (K) (emphasis added). Based on the data provided by the Clerk, 26 of the 125 prospective jurors for the July 2021 grand jury venire resided outside of the Oklahoma City Division.[6] Those 26 individuals live in 16 separate counties

---

unable to timely discover and raise the alleged deficiencies in the Court's jury selection procedures, which are set forth in general orders filed in 2009 and 2014, respectively.

[6] Defendants frivolously take issue with the fact that the Clerk sent summonses to 125 individuals on June 21, 2021 for the grand jury empaneled in July 2021. Defendants contend that somehow the Clerk did not follow the Court's jury selection plan because G.O. 09-02 "does not state that only '125 summonses' are to be sent" and because "this number appears to be arbitrarily" drawn. Supplement at 10. Defendants, again, fail to read G.O. 09-02, which states: "the Clerk shall draw at random from a divisional qualified jury wheel . . . *as many names of persons as may be required* for assignment to grand and petit jury panels." ¶ (J). The jury selection plan grants the Clerk discretion to determine how many potential jurors should be summoned. And given that grand juries consist of only 23 jurors, 125–130 individuals are clearly reasonable numbers of potential jurors to summon. Defendants also make vague allegations that a mystery juror was included in the July 2021 grand jury pool. They assert that although the Clerk explained that she sent summons to 125 individuals, the table for this grand jury pool included in

throughout the district. For the July 2022 grand jury venire, 39 of the 130 prospective jurors resided outside of the Oklahoma City Division. Those 39 individuals live in 18 separate counties throughout the district.

The factual basis for Defendants' claim challenging the Court's grand jury selection procedures is flatly incorrect. And their claim that the venire for the grand juries that returned indictments in this case do not represent a fair cross-section of the community is groundless. Accordingly, Defendants have identified no basis to dismiss the Indictment or Superseding Indictment.

So all that remains for resolution is Defendants' Sixth Amendment fair cross-section claim regarding the Court's jury selection procedures for petit juries.[7]

### C.  Defendants' Sixth Amendment claims fail on the merits.

The Sixth Amendment to the United States Constitution states:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

"[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community," *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975), and the

_____

the Clerk's Response lists 126 individuals. However, the table accurately reflects that the Clerk sent summons to 125 individuals. No mystery here.

[7] Were Defendants' JSSA claim timely or their contentions regarding the Court's grand jury selection procedures at least arguably supported, the Court would deny that claim on its merits for the same reasons set forth below.

Sixth Amendment guarantees a defendant that right. *Green*, 435 F.3d at 1270. Defendants do not, however, "have a right to a jury of 'any particular composition' and the jury actually chosen does not have to 'mirror the community.'" *Id.* (quoting *Taylor*, 419 U.S. at 538). "In general, criminal defendants have a Sixth Amendment right to 'object to a venire that is not designed to represent a fair cross section of the community, whether or not the systematically excluded groups are groups to which he himself belongs.'" *United States v. Prince*, 647 F.3d 1257, 1264 (10th Cir. 2011) (quoting *Holland v. Illinois*, 493 U.S. 474, 477 (1990)).

To show a violation of the right to a jury drawn from a fair cross-section of the community, Defendants must show:

1. the group alleged to be excluded is a "distinctive" group in the community;
2. the representation of this group in jury venires is not fair and reasonable in relation to the number of such persons in the community; and
3. the underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Green*, 435 F.3d at 1271 (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). It is a defendant's burden to establish each of these elements. *United States v. Shinault*, 147 F.3d 1266, 1271 (10th Cir. 1998); *see United States v. Hill*, 197 F.3d 436, 445 (10th Cir. 1999) (affirming the denial of a fair cross-section claim because the movant, despite establishing the first element, "failed to present evidence to establish the second and third prongs of the prima facie test"). "If the defendant proves a prima facie violation, the government then bears the burden of proving that attainment of a fair cross section is incompatible with a significant state interest." *Shinault*, 147 F.3d at 1271.

10

Upon review of the initial claim (that individuals living in rural counties outside of the Oklahoma City Division are excluded by the Court's jury selection plan) and the new claim (that members of federally recognized Indian Tribes headquartered outside of the Oklahoma City Division are excluded) the Court finds that Defendants fail to show a distinctive group in the community that has been excluded from jury service.

### 1.  Defendants' Initial Claim: Residents of Rural Counties

Starting with the claim that the Court's jury selection plan unconstitutionally excludes residents of rural counties, Defendants do not show a distinctive group. Courts consider three factors in determining whether a group is distinctive for purposes of a fair cross-section claim:

> 1) the group is defined by a limiting quality (i.e. the group has a definite composition such as race or sex); 2) a common thread or basic similarity in attitude, idea, or experience runs through the group; and 3) a community of interests exists among members of the group such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process.

*Green*, 435 F.3d at 1271 (citing *United States v. Raszkiewicz*, 169 F.3d 459, 463 (7th Cir. 1999); *United States v. Fletcher*, 965 F.2d 781, 782 (9th Cir. 1992); *United States v. Canfield*, 879 F.2d 446, 447 (8th Cir. 1989); *Ford v. Seabold*, 841 F.2d 677, 681–82 (6th Cir. 1988); *Barber v. Ponte*, 772 F.2d 982, 986–87 (1st Cir. 1985); *Willis v. Zant*, 720 F.2d 1212 (11th Cir. 1983)).

Defendants make no attempt to persuade the Court that residents of counties outside the Oklahoma City Division, as a collective, meet any of these factors. At most, the Motion states that individuals within this group are cognizable because they "may not

work in the silk-stocking, ivory tower buildings of a Fortune 500 oil company." Motion at 2. This is speculative and insufficient to meet Defendants' burden.[8]

Further, their claim is foreclosed by Tenth Circuit precedent. In *United States v. Test*, the Circuit explained that "[m]ere geographical imbalance, absent evidence that an identifiable and cognizable segment of the community has been systematically excluded or underrepresented by reason of such imbalance, does not violate the statutory and constitutional requirement that the jury panel represent a fair cross section of the community." 550 F.2d 577, 581 n.4 (10th Cir. 1976) (citations omitted). Later, in *United States v. Green*, the Circuit found that a defendant asserting a fair cross-section claim based on the Northern District of Oklahoma's exclusion from jury service of drivers who live outside of Tulsa county, but do not vote had not met the distinct group element partly because "a person's geographic location [does not] place that person in a distinct group." 435 F.3d at 1272. Therefore, Defendants' claim that residents of counties outside the Oklahoma City Division are unconstitutionally excluded from jury service fails to identify a distinct group.

---

[8] It is also illogical. Defendants offer no explanation for why individuals who live outside the Oklahoma City Division are distinct from (or would hold different predispositions to oil and gas companies than) individuals living in or around Chandler, Guthrie, Kingfisher, Watonga, El Reno, Chickasha, Purcell, Pauls Valley, or Shawnee, Oklahoma—all of which are county seats for counties included in the Oklahoma City Division. For that matter, no such blanket distinction is readily apparent to the Court for individuals living in or around Oklahoma City or Norman, Oklahoma either.

## 2.  Defendants' New Claim: Members of Federally Recognized Indian Tribes

Next, taking up the claim asserted for the first time in the supplemental brief—that the Court's jury selection plan unconstitutionally excludes members of federally recognized Indian tribes headquartered outside of the Oklahoma City Division—Defendants do not show a distinctive group. Defendants characterize the group that makes the basis for this claim in broad terms: essentially all members of Indian tribes that are headquartered outside of the Oklahoma City Division. This description is inexact. As recognized by Mr. Smith in his affidavit, not all members of tribes live on or near their tribe's headquarters or reservation. [Doc. No. 156-2] at 3. While "many (if not most) tribal members" may remain in an area close to their tribe's headquarters, *id.*, many Native Americans, including presumably members of the tribes mentioned by Defendants, live within the Oklahoma City Division. The group Defendants assert has been excluded by the Court's jury selection plan is thus more appropriately characterized as members of tribes who live outside of the Oklahoma City Division near their tribe's headquarters or reservation.

Defendants assume, without analyzing, that this group is distinctive. To be sure, Native Americans constitute a distinctive group in the community. *United States v. Yazzie*, 660 F.2d 422, 426 (10th Cir. 1981) ("There is no question that Indians constitute a distinctive group in the community . . . ."). But Defendants do not provide the Court with any concrete evidence or analysis to assess whether the sub-group of Native

Americans excluded from the Court's jury selection plan by virtue of their county of residence is a distinctive group.

The question relevant to determine the distinctiveness issue is whether members of these tribes who live outside the division are a group distinct from those who live within the division. The Tenth Circuit has not addressed this particular issue.[9] The government points the Court to *United States v. Raszkiewicz*, 169 F.3d 459 (7th Cir. 1999), which involved a fair cross-section claim substantially similar to the one asserted by Defendants. There, a defendant challenged the jury selection procedures of the Eastern District of Wisconsin, arguing that they violated his right to a jury selected from a fair cross-section of the community because they excluded "all Indians who live on the six reservations in the" district. *Id.* at 461. Like this Court's procedures, the jury selection plan at issue in *Raszkiewicz* operated "to exclude all Indians who live on reservations—'reservation Indians'—from venire plans" but did not operate to exclude "'[u]rban Indians,' who live away from reservations" and within the court's division. *Id.* at 462.

The *Raszkiewicz* court ultimately found that the defendant failed to establish that the group he identified was excluded from jury service—"reservation Indians"—was a distinctive group. *Id.* at 467. The court approached the distinctiveness issue based on the evidence and argument presented by the defendant. *Id.* ("This does not mean that with a different record or more precise and concrete argument, we would not conclude that

---

[9] The Tenth Circuit has denied a previous claim that this district's jury selection procedures violate the Sixth Amendment's and the JSSA's fair cross-section requirement. *United States v. Orange*, 447 F.3d 792, 801 (10th Cir. 2006)

reservation Indians are a distinctive group and that their exclusion from the jury selection process violated a defendant's constitutional and statutory rights."). Ultimately the court found that defendant's arguments based on the three-part test for why "reservation Indians" were a distinctive group lacked precision and concreteness and concluded that the "results of [the] three-part sociological inquiry [were] inconclusive." *Id.* at 466.[10] Defendants' evidence and arguments toward the distinctiveness issue here likewise lack precision and concreteness.

Rather than answering the question relevant for purposes of their fair cross-section claim, Defendants answer a separate question: whether members of a particular tribe are a group distinct from members of another tribe. The affidavits of Mr. Smith and Mr. Bellmard both explain—and the Court in no way doubts—that Native American tribes are diverse in cultural and social characteristics with different histories and traditions. [Doc. Nos. 156-1 and 156-2]. This reality does not resolve the issue here, however.

As explained, Defendants' bear the burden of establishing the distinct group element. Significantly, Defendants do not provide detailed application in their supplemental brief of the three-part test courts use to determine whether a group is distinctive. *See Green*, 435 F.3d at 1271. They engage in no concrete analysis discussing whether:

---

[10] The *Raszkiewicz* court thus looked to the purpose of the fair cross-section requirement to resolve the distinctiveness question. *Id.* The primary purpose of the Sixth Amendment's fair cross-section requirement is to assure an impartial jury. *Holland v. Illinois*, 493 U.S. 474, 480 (1990). The defendant there presented nothing that indicated to the court that exclusion of "reservation Indians" raised any doubt as to the impartiality of jury venires that included "urban Indians." *Raszkiewicz*, 169 F.3d at 466.

- members of tribes who live near their tribe's headquarters or reservation, which are outside of the Oklahoma City Division, are defined by a limiting quality distinct from tribal members who live within the division;

- a common thread or basic similarity in attitude, idea, or experience runs through this group that is distinct from those who live within the division; or

- a community of interests exists among members of the group such that the group's interest cannot be adequately represented by inclusion of tribal members who live within the division.

Careful analysis as to why the group of tribal members excluded by the Court's jury selection plan are distinct from the group of tribal members who are included is necessary to establish the claim Defendants assert. They do not, however, venture into this conversation, and the limited discussion Defendants do include is confined to the separate question of whether Indian tribes are distinct from one another, a reality the Court reiterates that it does not doubt.

Defendants point the Court to two cases for the first time in their supplemental brief: *United States v. Tranakos*, 690 F. Supp. 971 (D. Wyo. 1988) and *Alvarado v. State*, 486 P.2d 891 (Alaska 1971). In *Tranakos*, the District of Wyoming found that its jury selection plan failed the fair cross-section requirement because the division from which it selected potential jurors excluded the Wind River Reservation, which is where most Shoshone and Arapaho tribal members lived. 690 F. Supp. at 976–77. The *Tranakos* court made a precise decision on a specific record—it did not make broad-sweeping judgments about jury selection plans that might operate similarly. The court reached its decision based on the movant's thoughtful and developed presentation, which included census data and detailed testimony breaking down the number of tribal members who

16

lived within and outside of the court's division. *Id.* at 976. As explained, Defendants have done little to develop the facts that would support their claim. And *Alvarado* dealt with what the Supreme Court of Alaska termed the "unique" problem of picking a jury in Alaska. 486 P.2d at 905 ("Because of the vast expanses of land which lie within the borders of our state, because of the variety of the cultural heritage of our citizens, and because of the relative sparseness of our population, the problem of selecting juries in Alaska is unique."). It was also decided based on the substantial evidence presented by the movant, which "vividly portray[ed] the enormous gulf which separate[d] the mode of life of the typical Alaskan villager from the type of existence led by most residents of Anchorage and other cities of the state." *Id.* at 899.

Perfunctory citation to cases touching on similar issues, without more, is insufficient to meet Defendants' burden to establish the distinctive group element for their specific fair cross-section claim. These cases, beyond the fact that they are non-binding, do not rescue Defendants' claim. In fact, *Tranakos* recognized that fair cross-section claims necessarily require movants to meet their burden of establishing the distinctive group element. 690 F. Supp. at 975 ("The decisional law requires the movant to present facts persuasive that there is a cognizable group having an underrepresentation in the group from which grand juries are selected under circumstances that despoil a chance of there being a fair cross-section.").

Based on the record and arguments currently before the Court, Defendants have not met their burden of establishing the first prima-facie element for either of their Sixth Amendment fair cross-section claims. Their claims are therefore denied.

### III.  <u>CONCLUSION</u>

For these reasons, and based on the parties' submissions and relevant law, the

Court DENIES Defendant James Dyer's Motion to Strike and Challenge Jury Array, Jury

Panel(s), and Dismiss Indictment [Doc. No. 1] for Improper Selection of Grand and Petit

Jurors [Doc. No. 61], which Defendant Blaine Dyer joins in, adopts, and incorporates on

his behalf [Doc. No. 99],[11] and as supplemented at [Doc. Nos. 153 and 156].

IT IS SO ORDERED this 13th day of February 2023.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

---

[11] Blaine Dyer's Notice of Motion and Motion for Joinder in Motions of Co-Defendant James Dyer [Doc. No. 99] is granted only to the limited extent that Blaine Dyer is allowed to join in James Dyer's Motion [Doc. No. 61], but it is otherwise denied on the merits as to that issue. The Court will rule on the other joinder aspects as they arise with each individual motion.