**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-22-00209-JD |
| | ) | |
| BLAINE DYER and | ) | |
| JAMES ("JIMMY") DYER, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS AND CONCLUSIONS ON LOSS AMOUNT,
ROLE ADJUSTMENTS, RESTITUTION, AND FORFEITURE**

The following findings and conclusions regarding the amount of loss and certain role adjustments for purposes of calculating the advisory guideline range, and the appropriate amount of restitution and forfeiture, supplement the findings the Court will announce during the sentencing hearing to be held on May 30, 2024. On the issues addressed herein, these findings are not intended to touch on every fact, or all evidence relied on by the Court, but instead to address facts and evidence the Court considered particularly informative and persuasive. The overall findings and conclusions in this case are based on all the facts, evidence, testimony, and circumstances properly presented to the Court.

## I.   BACKGROUND

On February 17, 2023, Defendant Blaine Dyer pled guilty to Count One of the Superseding Information [Doc. No. 199] charging conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 371. On February 16, 2023, Defendant James

("Jimmy") Dyer pled guilty to Count One of the Superseding Indictment [Doc. No. 84] charging conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349. Their guilty pleas included forfeiture. [Doc. Nos. 84 at 21–22; 193 at 5; 199 at 12; 202 at 5–6]. Specifically, Blaine Dyer agreed to forfeit property to the United States "[a]s alleged in the superseding information." [Doc. No. 201 at 5]. Jimmy Dyer agreed to forfeit property to the United States "[a]s stated in the Superseding Indictment." [Doc. No. 192 at 5]. With respect to forfeiture, Blaine Dyer and Jimmy Dyer agreed under their respective plea agreements:

> to forfeit to the United States voluntarily and immediately all of Defendant's right, title, and interest in and to all assets which are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c), 18 U.S.C. § 982(a)(2), and 28 U.S.C. § 2461, including but not limited to a personal money judgment in the amount of the proceeds obtained as a result of the offenses. Defendant agrees that these proceeds were involved in the violation to which Defendant is pleading guilty.

[Doc. Nos. 193 at 5; 202 at 5]. Additionally, Defendants "knowingly and voluntarily waive[d]" [their] right to a jury trial on the forfeiture of assets." *See id.*

Their guilty pleas also included restitution. Specifically, Defendants agreed that as part of the sentence resulting from their pleas, "the Court will enter an order of restitution to all victims of [Defendants'] relevant conduct as determined by reference to the United States Sentencing Guidelines ["U.S.S.G."]." *See id.* at 3. Blaine Dyer agreed "that the loss amount pursuant to U.S.S.G. § 2B1.1 is not more than $3,500,000.00." [Doc. No. 202 at 7]. The Final Presentence Investigation Reports [Doc. Nos. 234 & 235] for both Defendants were filed by the United States Probation Office ("USPO") on December 26, 2023. The USPO noted in both reports that the issues of guideline loss and loss for

restitution purposes were "extremely complex," and a hearing was necessary to resolve the issues. [Doc. Nos. 234 at 21 & 235 at 27]; *see also* [Doc. No. 236 at 1]. Thus, the Court set the matter for an evidentiary hearing. [Doc. Nos. 236 at 1, 237, & 257 at 2].

The Court held an evidentiary hearing on March 19, 2024, and April 8, 2024, at which Blaine Dyer personally appeared through his attorneys, L. Justin Lowe and Michael S. Johnson; Jimmy Dyer personally appeared through his attorney, Robert D. Gifford, II; and the United States appeared through Assistant United States Attorneys Julia E. Barry and Brandon Hale. [Doc. Nos. 274, 277].[1] The Court received the testimony of seven witnesses: FBI Special Agent Jason Wildeman, Mark Oekerman, Matt Simmons, Mitchell Coatney, Justin Biggs, Jimmy Dyer, and Blaine Dyer. *See id.* Government's Exhibits 1 through 57 were offered and admitted for purposes of the hearing. *See id.* Defendant's Exhibits 1–5, 7, 10–11, 14–27, 31–47, 49, 58, and 62 were referenced, but were not admitted by counsel.[2] *See id.*

---

[1] Also present at the March 19 hearing was Justin Biggs, with his counsel William H. Bock, and Mitchell Coatney, with his counsel Jay D. Husbands. [Doc. No. 274 at 1–2]. The Court excused Mr. Biggs, Mr. Coatney, and Jimmy Dyer, along with their counsel, from attending the continued hearing on April 8. *See id.*

[2] Additionally, the Court has reviewed the Final Presentence Investigation Report ("PSR") [Doc. No. 234] and Addendum outlining various objections to the PSR by the United States and Blaine Dyer; the United States' Sentencing Memorandum and accompanying exhibits [Doc. Nos. 247, 247-1–9, & 248]; Defendant Blaine Dyer's Sealed Sentencing Memorandum [Doc. No. 251]; the United States' Response in Opposition to Defendant's Sentencing Memorandum [Doc. No. 258]; and Defendant's Response to the United States' Sentencing Memorandum [Doc. No. 261].

At the hearing on March 19, counsel for Jimmy Dyer announced an agreement as to restitution had been reached between Jimmy Dyer and Continental Resources, Inc. ("CLR"), that Jimmy Dyer would be stipulating to forfeiture (by a money judgment), and that a joint notice memorializing same would be filed.[3] [Doc. Nos. 274 at 1 & 270 at 2]. Additionally, Jimmy Dyer withdrew his objection to the two-level enhancement for sophisticated means. [Doc. No. 274 at 1]. At the hearing on April 8, Blaine Dyer withdrew his objection to paragraph 37 of the PSR applying the leader/organizer role adjustment, and the government accepted his withdrawal. [Doc. No. 277 at 1]. Therefore, Blaine Dyer's objection to paragraph 37 of the PSR is withdrawn.

Thus, the following issues remain for the Court's resolution with respect to Blaine Dyer (only): (1) loss amount under the guidelines; (2) applicability of the abuse of trust/use of special skill role adjustment; (3) restitution; and (4) forfeiture.

II.    **DISCUSSION**

A.    **Calculating Loss Amount under U.S.S.G. § 2B1.1**

In calculating loss under the guidelines, the Court is not limited to conduct underlying the offense of conviction, but rather may consider all the defendant's relevant conduct. *See United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009); *see also*

---

[3] Jimmy Dyer filed a Joint Notice Regarding Restitution and Forfeiture as to James ("Jimmy") Dyer ("Joint Notice") [Doc. No. 282] on May 24, 2024. The Joint Notice indicates that Jimmy Dyer, the government, and CLR have reached an agreement relating to the amount of restitution. *See id.* They ask the Court to order Jimmy Dyer to pay restitution in the amount of $2,466,185.43 to CLR, not subject to offset for CLR's civil recoveries. *See id.* The Joint Notice also references forfeiture in the form of a personal money judgment by Jimmy Dyer in the amount of $230,761.74. *See id.*

U.S.S.G. § 1B1.3. Here, the parties disagree on the amount of loss and the methodology to calculate loss in this case. When a loss amount is disputed, the United States bears the burden of establishing its estimation of loss by a preponderance of the evidence. *See Griffith*, 584 F.3d at 1011.

Under the U.S.S.G., "loss" means "the greater of actual loss or intended loss," with "actual loss" defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. n. 3(A)(i). "Intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* cmt. n. 3(A)(ii). Where evidence of direct loss is not available, the district court "need only make a reasonable estimate of loss." *Id.* cmt. n. 3(C). Additionally, "if there is a loss but it reasonably cannot be determined," "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss." *Id.* cmt. n. 3(B).

Because of the district court's "unique position to assess the evidence and estimate the loss based upon that evidence," its loss determination is "entitled to appropriate deference." *See id.* (citing 18 U.S.C. § 3742(e) & (f)); *see also United States v. Masek*, 588 F.3d 1283, 1287 (10th Cir. 2009) (explaining that "loss need not be determined with precision" and that the "court need only make a reasonable estimate of the loss, given the information available"). However, "a loss estimate is reasonable only when it is calculated under a reasonable method." *United States v. James*, 592 F.3d 1109, 1115 (10th Cir. 2010) (remanding with instructions for the district court to recalculate the actual losses of the 10 original lenders).

The United States asserts that regardless of the methodology applied, Blaine Dyer and his coconspirators caused between $1.5 million and $3.5 million in loss under § 2B1.1, which equates to a 16-level increase to the offense level under § 2B1.1(b)(1)(I). The USPO also recommends a 16-level increase to Blaine Dyer's offense level for loss, opining that under either method—gain from the offense or the cost of developing proprietary information—the result would be application of the same loss enhancement of 16 levels. PSR at ¶¶ 21–23, 33.

Specifically, the government contends that CLR was deprived of the honest services of its employee, Justin Biggs, when Mr. Biggs used his position to enrich Blaine Dyer, himself, and the other coconspirators to the detriment of his employer, CLR. [Doc. No. 247 at 12]. Thus, the government asserts that the loss suffered for guideline purposes is the value of Mr. Biggs' honest service, which is "an inherently difficult amount to determine." *See id.* Nonetheless, the government contends that the guidelines contemplate this scenario by directing the court to "use the gain that resulted from the offense as an alternative measure of loss" where "there is a loss[,] but it reasonably cannot be determined." U.S.S.G. § 2B1.1, cmt. n. 3(B). To that end, the government asserts that the coconspirators' gain is "an approximation" of the loss amount for guideline purposes. [Doc. No. 247 at 13].

Additionally, the government asserts that the geological map[4] (Government's Ex. No. 10) that Mr. Biggs shared with the coconspirators, and which the coconspirators used

---

[4] The Court does not, in anyway, rely on the alleged value of the map in its analysis herein.

to determine what leases to acquire, was valued at $2,389,848.45, warranting the same 16-level increase to the offense level. *See id.* at 14; *see also* [Doc. No. 258 at 5 (noting that the costs incurred by CLR in producing the map mirror the coconspirators' gain)]. Government counsel, in closing argument, clarified that the government was offering the development costs of the map *only* as additional evidence to support utilizing gain as the proper methodology to calculate loss and not as a separate theory of loss.

By contrast, Blaine Dyer asserts in his sentencing memorandum and in his response to the government's sentencing memorandum that a percentage calculation of Mr. Biggs' salary is "an easily ascertainable number," as opposed to calculating the coconspirators' gain. [Doc. Nos. 261 at 5 & 251 at 20]. Therein, his counsel advocates for a loss computation method of 20 percent of Biggs' salary for the years 2014 and 2015, which counsel indicates would equate to "$36,000.00 in damages to [CLR]." [Doc. No. 251 at 20]. Defense counsel, however, does not cite to any legal authority to support this approach. Conversely, in the Addendum to the PSR, Blaine Dyer asserts that the geological map contained more than eight million service acres of which the coconspirators purchased only 2,330 acres, which represents less than 0.002 percent of the value of the map. PSR at 23. Thus, he asserts, under that theory, the loss to CLR would be less than $1,000.00. *See id.*

Finally, in closing argument at the evidentiary hearing, counsel for Blaine Dyer asserted that CLR bought the leases at a discounted price; thus, there was no actual loss or damages sustained by CLR. Additionally, he asserted that the Court could base its estimate of loss on "[t]he fair market value of the property unlawfully taken" under

U.S.S.G. § 2B1.1, cmt. n. 3(C)(i), if the government had presented testimony or evidence of the fair market value of the leases, which he contends it did not.

Here, the Court must "'assess the evidence and estimate the loss based upon that evidence.'" *Griffith*, 584 F.3d at 1011 (quoting U.S.S.G. § 2B1.1, cmt. n. 3(C)). Additionally, it must use a reasonable method to calculate the loss. The Court finds authority from the Tenth Circuit's sister circuits instructive on which method to use to calculate loss in an honest services fraud case. *United States v. Woodard*, 459 F.3d 1078 (11th Cir. 2006) and *United States v. Crandall*, 525 F.3d 907 (9th Cir. 2008) provide support for using offender gain as the appropriate method to calculate loss in this case.

Following a jury trial, John and Debra Woodard were convicted of multiple counts of mail fraud and conspiracy to commit mail fraud and deprivation of honest services, in violation of 18 U.S.C. §§ 371, 1341, and 1346. *See Woodard*, 459 F.3d at 1082. They challenged their convictions and sentences on appeal, including the amount of loss and restitution. The Eleventh Circuit explained that "[w]hen considering the loss caused by fraudulent conduct, the nature of the individual scheme [determines] the correct way to measure the loss." *See id.* at 1087.

The evidence at trial showed that the Woodards, who were spouses, used the U.S. mail to carry out a scheme to defraud the City of Atlanta, Georgia (the "City"), and the rightful owners of money and property held in the custody of the Atlanta Police Department. *See id.* at 1082. Mr. Woodard was employed by the City as a police officer, and he had previously been the captain in charge of administering the police department's property control unit, which maintains custody and control of property seized by the

police department, including money. *See id.* Mr. Woodard formed a company known as RAP and charged clients a fee (often 50 percent of the reclaimed funds) to reclaim their money from the police department. Debra Woodard was RAP's chief executive. After RAP was formed, Mr. Woodard continued to serve as an officer of the police department but in a different capacity, outside the property control unit. *See id.*

To facilitate its business, RAP would contact people with unclaimed money held by the police department, and clients would execute a limited power of attorney, empowering an employee of RAP to act as an intermediary. *See id.* RAP would then reclaim the money and pay to the client the client's share. *See id.* Evidence at trial showed that RAP relied on confidential information obtained by Mr. Woodard to locate and contact potential clients. *See id.* In total, the police department distributed $710,262.00 to RAP. *See id.* at 1083. RAP returned $43,243.00 to the police department. *See id.*

At sentencing, the trial court calculated the total loss amount to be $710,262.00 for guideline purposes and ordered the Woodards to pay $333,504.00 in restitution to the City. *See id.* The restitution figure considered that some of RAP's clients received from RAP only 50 percent of the money owed to them by the City. *See id.* On appeal, the Woodards argued that the trial court had erred in calculating the total loss amount and in ordering that restitution be paid to the City. *See id.*

The Eleventh Circuit concluded that "the correct loss amount should be based on the proceeds from [the Woodards'] fraudulent conduct," i.e., "the deprivation of John Woodard's honest services," and that "[e]very dollar RAP took from the City resulted

from depriving the City of John Woodard's honest services." *See id.* at 1087. Thus, *Woodard* supports using an offender's proceeds, or gain, to estimate loss in a deprivation of honest services case.

Similarly, *United States v. Crandall* offers support for the gain methodology. In *Crandall*, the defendants appealed their convictions and sentences for mail, wire, and honest services fraud and asserted that the trial court had used the wrong method to calculate loss. *Crandall*, 525 F.3d at 909. The Ninth Circuit agreed that the trial court had erred in calculating the loss suffered by the victims of the fraud, but it did not settle on one approach. *See id.* at 913.

It explained that in calculating loss for sentencing purposes, the "focus is on the loss inflicted upon the victims." *See id.* "Depending on the nature of the fraudulent scheme involved, there may be still other approaches a district court could properly employ to determine loss for purposes of sentencing in a fraud case involving real property." *See id.* at 915. Additionally, the circuit explained that if "the loss from the fraud cannot be reasonably determined," the trial court should "'use the gain that resulted from the offense as an alternative measure of loss . . . .'" *See id.* (quoting U.S.S.G. § 2B1.1, cmt. n. 3(B) & referencing the difference between the defendants' cost of purchasing the apartment buildings versus the gross sales price paid by the victims, i.e., the offenders' gain or profit). Finally, it reinforced that "whatever approach the district court takes, it must take a realistic, economic approach that reflects the monetary loss to the victims of the fraud." *See id.* Both cases highlight that the nature of the fraudulent scheme and the monetary loss sustained by the victim of the fraud are at the forefront

when calculating loss for guideline purposes. The offender gain method meets those parameters in the instant case.

First, as evidenced below, it is tied to the nature of the fraudulent scheme and the coconspirators' intended or anticipated profit or pecuniary harm. Second, the gain methodology focuses on the monetary loss sustained by CLR.

Blaine Dyer pled guilty to conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 371. The object of the conspiracy, as alleged in the Superseding Information, was enrichment. Blaine and Jimmy Dyer, along with their coconspirators, Justin Biggs and Mitchell Coatney, and others, intended to enrich themselves through the unlawful use and exploitation of CLR's drilling and leasing plans that Biggs provided by virtue of his employment as a Senior Landman at CLR in exchange for a 30 percent kickback of any profits that Biggs' insider information yielded. The plan also involved purchasing leaseholds in Oklahoma with this insider information, packaging them for resell, and then selling them to CLR for a profit. *See, e.g.*, *James* Hr'g Tr. at 7 [Doc. No. 271].

The fraudulent scheme was first discussed on a hunting trip to Tipton, Oklahoma, in late 2013. Present on the trip were Mitchell Coatney,[5] Justin Biggs,[6] Bob Dyer

---

[5] Mr. Coatney pled guilty to conspiracy to commit honest services wire fraud. *See* Case No. CR-21-282-JD. His sentencing is currently set for June 27, 2024. Mr. Coatney was Blaine Dyer's law partner.

[6] Mr. Biggs pled guilty to conspiracy to commit honest services wire fraud. *See* Case No. CR-20-307-JD. His sentencing is currently set for June 27, 2024.

(Blaine's father), Jimmy Dyer, and Blaine Dyer. *See* Government's Ex. No. 16 (hunting trip photograph). Mr. Coatney testified that he and Blaine originally put the trip together to "wine and dine" Mr. Biggs to continue receiving legitimate title business from CLR.[7] He also testified that the hunting trip was the origin of the conspiracy. Mr. Biggs, Blaine Dyer, and Mitchell Coatney traveled in the same car to the hunting trip. Jimmy Dyer and Bob Dyer were in a separate car; thus, they were not privy to this initial conversation. However, Jimmy Dyer testified that he learned of the conversation about a month later.

Inside the car, the three discussed how people were getting rich in the oil and gas business by buying and flipping leases. Mr. Coatney indicated that Mr. Biggs had the necessary intel to make the venture less risky. Mr. Biggs advised that he told them that he had provided insider information on a previous occasion to another individual in exchange for kickback payments. Biggs indicated that Blaine suggested he do the same for him, but Biggs was unsure how serious Blaine was until he received an email from Blaine Dyer on December 5, 2013, with the subject line, "This is no joke." *See* Government's Ex. No. 17. Mr. Coatney testified that this email sent by Blaine to Biggs and Coatney was the first step in moving the conspiracy forward. Both Coatney and Biggs confirmed receiving the email a couple of weeks after the hunting trip. The email provided as follows:

---

[7] Mr. Biggs testified that he first met Blaine Dyer at a skeet shoot in August 2011, at which Blaine told him he had started his own law firm and was looking for title opinion work. At the time, Biggs responded that CLR was always looking for good title attorneys. Subsequently, Biggs began sending title work to Blaine. *See* Government's Ex. Nos. 13–14.

See attached. W/r/t Scoop stuff, let me know any sections that have tracts with enough open acreage to mess with and I'll knock them out. The best bet would be sections that had nasty tracts that the brokerage couldn't run or didn't want to mess with. I'll run them personally.

There are a million different ways to swing this and get rich, but let me put it this way. We have hundreds of thousands in cash available right now, we are smart as shit, and we have a fucking ton of inside connections. THERE IS NO WAY WE FAIL OR DON'T GET RICH AS FUCK. If we do this right, we'll be sipping on umbrella drinks at 35 (sorry Mitch, forgot you were old balls, 40 for you) watching our fortunes gain interest and continue to grow from producing wells.

I can't express how sincere I am when I say that if we don't have a $50 million plus company in a few years I will be disappointed and shocked. I didn't build a multi-million dollar law firm at 30 by fucking around and this is going to be no different, just bigger.

The main E&P company that will be used in the permanent deals is going to be Firehawk Energy unless one of you opposes. Deals to be flipped will be done under various other companies if conflict of interest exists.

Justin, if you want to use my [P]angaea account so CLR is unable to track what you are doing, let me know and I'll add a user to my account. Anything else we need to make this discreet, convenient or otherwise, just let me know and it will be done. We will have a PO Box for an address. Calls will be made from go phones so no caller ID comes up or we can register phones under company names. Justin will be mostly behind the scenes except for what he chooses to do at home on the evenings or weekends. I'm just going over some basics, all else will be spelled out when/after we meet next week.

Looking forward to this.

Blaine M. Dyer, Esq.

*See* Government's Ex. No. 17.

According to Coatney, not long after the email was sent, Blaine Dyer, Coatney,

Jimmy Dyer, and Biggs met. At the meeting, they began identifying sections and areas of

land of interest; what information they would need from Biggs to run title; how to set up

13

companies; and other ideas to avoid being detected. Coatney indicated Blaine led the discussion, but everyone brainstormed ideas. Blaine suggested that the proceeds be divided 30 percent to Coatney, 30 percent to Biggs, 30 percent to Blaine, and then a percentage to Jimmy Dyer and to whomever was the face of the company. Throughout the conspiracy, the group continued to meet either at Blaine's law office or his house and exchanged text messages and emails.

Each coconspirator played a different role in the scheme. Everyone agreed that Blaine Dyer was at the head of the scheme; he also conducted title examinations. Blaine Dyer provided most of the money to purchase leases, with Biggs providing money on one occasion. *James* Hr'g Tr. at 8–9. Jimmy Dyer's role was to negotiate and acquire leases. *See id.* at 9. Mr. Biggs was the "inside man" at CLR. As a Senior Landman, Biggs had access to information owned by CLR, which he provided to the rest of the coconspirators. *See id.* at 9–10. Mr. Coatney was Blaine Dyer's law partner, and his role was to perform title examinations. *See id.* at 10.

Coy Morgan, identified as Individual 1 in the Superseding Information, was the face of Enercore Resources LLC ("Enercore"), which was an entity formed by the coconspirators. Mr. Morgan did not live in Oklahoma; thus, he was brought in to be the face of Enercore and lend his name to help conceal the identity of the other coconspirators. *See id.* at 10–11. Morgan was Blaine Dyer's roommate in law school. *See id.* at 11.

The coconspirators took steps to avoid detection of their scheme and identities. Enercore was registered in Morgan's name because he had no ties with any oil and gas

operators in the SCOOP, and he would be unrecognizable. *See id.* at 12; *see also* Government's Ex. No. 22. Enercore also utilized a P.O. Box for mailings to conceal the coconspirators' identities and to alleviate any ties. *See id.* Jimmy Dyer used a pseudonym (Justin Roberts) and a fake email address to keep the Dyer name away from the project because Blaine was doing title work for CLR.

The FBI conducted a Cellebrite data dump from Mr. Morgan's phone. Government's Exhibit No. 21 shows recovered text messages. On April 3, 2014, Blaine Dyer texted Morgan indicating Blaine had bought 117 acres for $1500 an acre, resulting in a $94,000 profit. He advised he would send Morgan an updated spreadsheet to forward to CLR. *See* Government's Ex. No. 21. On April 20, 2014, Blaine texted Morgan telling him he had assignments for him to sign and email to Biggs. *See id.* The next day, Blaine instructed Morgan to send the spreadsheet over immediately and to ensure that Blaine's name was not on the properties and to send Biggs the wiring instructions for the Enercore bank account ASAP. *See id.* Blaine also provided specific language for Morgan to use in emails when selling lease packages from Enercore. S*ee* Government's Ex. Nos. 26–27.

The scheme resulted in two closings—one on April 22, 2014, and the second on August 29, 2014, identified by the government as Transactions 1 and 2. *See* Government's Ex. Nos. 1–8. Government's Exhibit No. 1 is an offer to purchase dated March 20, 2014, signed by Justin Biggs on behalf of CLR, to Enercore (attention: Coy Morgan). The offer is to purchase lease assignments, attached to Government's Exhibit No. 1, that Enercore acquired with information from Biggs in exchange for kickbacks. Government's Exhibit No. 2 is a wire transfer detail on April 22, 2014, from US Bank in

the amount of $3,462,533.32 debited to CLR's account. It lists Enercore as the
beneficiary. *See* Government's Ex. No. 2. Government's Exhibit No. 3 is a bank
statement for Enercore's account ending in 1057 and shows an incoming federal wire
transfer from CLR on April 22, 2014, in the amount of $3,462,533.32. *See* Government's
Ex. No. 3. Government's Exhibit No. 4 is a screenshot of Enercore's bank account ending
in 1057, exhibiting a total of $3,466,297.73. The screenshot was sent to Morgan from
Blaine Dyer. *See* Government's Ex. No. 4.

Government's Exhibit No. 5 is an offer to purchase dated July 24, 2014, signed by
Justin Biggs on behalf of CLR and Coy Morgan as managing member of Enercore. The
offer is to purchase lease assignments, attached to Government's Exhibit No. 5, that
Enercore acquired with inside information from Biggs in exchange for kickbacks.
Government's Exhibit No. 6 is a wire transfer detail on August 29, 2014, from US Bank
in the amount of $1,621,684.00 debited to CLR's account. It lists Enercore as the
beneficiary. *See* Government's Ex. No. 6. Government's Exhibit No. 7 is a bank
statement for Enercore's account ending in 1057 and shows an incoming federal wire
transfer from CLR on August 29, 2014, in the amount of $1,621,684.00. *See*
Government's Ex. No. 7. Government's Exhibit No. 8 is a screenshot of Enercore's bank
account ending in 1057, exhibiting a total of $1,803,028.15.[8] The screenshot was sent to
Morgan from Blaine Dyer. *See* Government's Ex. No. 8.

---

[8] There was a starting balance of $436,356.65 in the account. *See* Government's
Ex. No. 7.

Enercore received about $5 million from CLR in Transactions 1 and 2, which represents the gross amount of proceeds. The coconspirators incurred costs to acquire the leaseholds in the form of bonus payments to the mineral rights owners and brokerage fees to the landmen who went out and negotiated and acquired the leases. The coconspirators' intended or estimated gain is captured in Government's Exhibit No. 9 and closely mirrors the wire transfers in Transactions 1 and 2. Ultimately, they received about $30,000 less than what they anticipated because CLR accepted most, but not all, of the assignments listed in the second offer to purchase. The coconspirators estimated they would turn a profit of $2,496,378.12. *See* Government's Ex. No. 9. The email estimated broker costs to Jimmy Dyer's brokerage company, Wild Fox Energy, at $109,099.59. *See id.* The estimated profit was arrived at by adding the amounts from both closings and subtracting the lease bonus payments and the brokerage costs. *See id.* Mr. Simmons, a land supervisor for CLR, testified that Wild Fox Energy's broker rates were comparable with that of four other brokerage companies that CLR used in 2014. He also opined that CLR's lease bonus costs would have been the same as what Enercore paid, opining that CLR could have acquired the same oil and gas leases for roughly the same amount that Enercore did.

The gain methodology also focuses on the monetary loss sustained by CLR. Because of Biggs' dishonest services, CLR paid $5,084,217.32 on the back end for the leases acquired by Enercore when it could have acquired the leases at the same price Enercore acquired them, which was $2,508,932.30. *See* Government's Ex. Nos. 2, 6, & 9. Thus, CLR overpaid by $2,466,185.43 (figure represents $5,084,217.32 minus the

$2,508,932.30 paid to Enercore by the mineral owners minus the $109,099.59 in brokerage costs).

The USPO expressed some concern in paragraph 23 of the PSR that due to the competitive nature of leases, this figure could be speculative, as there was no guarantee CLR would have otherwise successfully acquired these leases that Enercore acquired.[9] *See* PSR at ¶ 23. The Court need only make a reasonable estimate of loss. Mr. Coatney testified that close to 99 percent of the assignments detailed in Exhibit A to the offers to purchase in Government's Exhibit Nos. 1 and 5 were acquired with the information that Justin Biggs provided.[10] Mr. Biggs, likewise, testified that 100 percent of it was. Here, the mineral owners agreed to sell, and CLR ultimately purchased the leases on the back end at a higher price. Regardless of what could have happened, CLR bought the leases. In

---

[9] Additionally, the USPO pointed to Blaine's email dated December 5, 2013, that indicated the group would focus on tracts with complicated title or ones brokerages would not "want to mess with." Blaine in his testimony at the evidentiary hearing, however, clarified that he knew these areas would be "attractive" to CLR because they would not have to pay for a brokerage firm to go out and run title on an entire section. Tr. at 18 [Doc. No. 279]. Rather, CLR, according to him, would be able to obtain the acreage from Enercore without the upfront costs and then have an ownership right in that section. *See id.* This negates the speculative nature since Blaine knew CLR would be interested.

[10] Mr. Coatney testified that Biggs provided buy zones, buy areas, starting prices, prices they could offer and still flip to CLR for a profit, updated drilling schedules, and real-time updates on what to counteroffer during negotiations with CLR. According to Biggs and Coatney, Biggs also provided the coconspirators with the map in Government's Exhibit No. 10, which graded the acreage in the SCOOP from A through F. Mr. Coatney testified that they acquired leases in the less favorable E and F zones also, if they knew they could resell it for a profit to CLR. Biggs also testified that he gave Blaine ownership reports on some sections of land, and he told him what price per acre CLR was willing to pay and what areas to acquire leaseholds in. Biggs also recalled providing the coconspirators with a map with the buyout line and writing in pen on one map what CLR would pay for each area and the coconspirators should offer.

other words, but for Justin Biggs' dishonest services, CLR could have gone out and acquired and purchased the leases from the mineral owners directly. There is no allegation that the mineral owners were defrauded or received an unfair price from Enercore.

Blaine Dyer asserted in his testimony that he and his team "worked our butts off." Tr. at 16 [Doc. No. 275]. Blaine Dyer and his team engaged in legitimate work using insider information. Because of Mr. Biggs' insider information, they knew what areas to focus on, and this substantially lowered their risk. They knew their scheme would be profitable because of Mr. Biggs' intel. Their risk was minimized with Biggs' information on where to purchase and how much CLR would offer on the back end. Without his information, they would have blindly been scooping up leases with the possibility they would not be able to flip and sell them. Both Mr. Coatney and Mr. Biggs testified that Biggs' insider information substantially reduced the coconspirators' risk. Mr. Biggs testified that the coconspirators knew at the very least what CLR would pay, and he also told them what to counteroffer with respect to at least one purchase agreement. He agreed that his real-time price updates to the coconspirators were a valuable part of the scheme. Mr. Coatney indicated that Biggs also provided them with updated drilling schedules, which was valuable information because if the coconspirators knew CLR was not actually going to drill a well, then they would move on to land with better prospects.

Biggs and Coatney both testified that they knew what they were doing was wrong. Biggs testified that it was well known that he should not be providing insider information to Blaine Dyer that would help him go out and acquire leases, and that this is why they

used Coy Morgan as the face of Enercore. He further testified that everyone involved knew it was wrong and that is why they wanted secrecy. Mr. Coatney testified that the coconspirators specifically discussed at the first meeting how to avoid being detected.

Thus, the Court finds that offender gain is the appropriate method to calculate loss in this case because it is directly tied to the nature of the fraudulent scheme, the coconspirators' intended or anticipated profit, and the monetary loss sustained by CLR, and it is supported by the evidence of record. Therefore, the Court overrules Blaine Dyer's objection to paragraph 23 of the PSR with respect to applying the offender gain method to calculate loss. As noted above, the Court does not rely on the alleged value of the map and has not considered that for purposes of its analysis herein. Based on the offenders' gain, the estimated loss amount is $2,466,185.43; thus, a 16-level increase to the offense level is warranted under U.S.S.G. § 2B1.1(b)(1)(I) (applying a 16-level increase where the loss is more than $1.5 million but less than $3.5 million). Accordingly, Blaine Dyer's objection to paragraph 33 is also overruled.

**B.    Abuse of Position of Trust or Use of Special Skill under U.S.S.G. § 3B1.3**

The PSR at paragraph 36 applies a two-level adjustment to Blaine's offense level, asserting that Blaine abused his position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense. PSR at ¶ 36; *see also* U.S.S.G. § 3B1.3. Specifically, the PSR asserts that Blaine used his position as an attorney with CLR, while obligated to represent the legal interests of CLR, to engage in fraud against CLR, i.e., he used confidential information to which he had access based on a legal relationship with CLR to commit the offense. Blaine objects to

application of this role adjustment, asserting that there is no evidence to support that he used his role as an attorney to defraud CLR. [Doc. No. 261 at 5]. He does not dispute that his status as a lawyer qualifies as a "special skill" under the guidelines, but rather he maintains that he "never used his position as an attorney while doing title opinions for [CLR] to engage in fraud against [CLR]." [Doc. No. 234 at 24]. The government asserts that "[t]his misses the point." [Doc. No. 247 at 17]. In closing, the government asserted that it was the attorney-client relationship between Blaine and CLR that was critical to the scheme's formation and execution. The government asserts that, without it, Blaine would not have had access to Biggs' information in the first place. The government's theory, however, expands the application of the role adjustment beyond its purpose and is not in line with the facts in evidence.

The United States has the burden by a preponderance to show that (1) Blaine occupied a position of trust; and (2) he used that position of trust to significantly facilitate the commission or concealment of the offense.[11] *See United States v. Spear*, 491 F.3d 1150, 1153 (10th Cir. 2007). The inquiry "is generally a factual matter" for the court. *See id.*

---

[11] It is unnecessary for the Court to determine whether Blaine used a special skill to significantly facilitate the commission or concealment of the offense because an aggravating role adjustment under § 3B1.1(a) has been applied to his offense level. *See* U.S.S.G. § 3B1.3 ("[I]f this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)." *See also United States v. Courtney*, 76 F. Supp. 3d 1267, 1300 (D.N.M. 2014) ("The Court cannot apply a special-skill enhancement in conjunction with an aggravating role enhancement, and the Guidelines suggest that, if both enhancements factually apply, the Court should apply the aggravating role enhancement and not the special-skills enhancement.").

Under U.S.S.G. § 3B1.3, "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." "For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." U.S.S.G. § 3B1.3, cmt. n. 1. The "'enhancement is not meant to apply in every case of fraud.'" *Spear*, 491 F.3d at 1154 (quoting *United States v. Edwards*, 325 F.3d 1184, 1187 (10th Cir. 2003)).

Citing to *United States v. Evans*, 44 F. App'x 449, 452 (10th Cir. 2002) (unpublished), the government asserts that Blaine was retained as a title attorney for CLR, and that this role afforded him "considerable freedom." [Doc. No. 247 at 16]. The government asserts that Blaine was the owner of The Blaine Dyer Law Firm, which afforded "him a level of unparalleled authority in assigning and conducting this work . . . [a]nd by virtue of this fiduciary position with [CLR], [he] had a head start—having been paid by [CLR] to 'run title' and determine who owned the leases that [CLR] wanted to acquire, he already knew who to approach to purchase those leases before [CLR] could." *See id.* at 16–17. Although not an attorney case, the focus in *Evans* was on the defendants' use of the fiduciary relationship to perpetuate and conceal the offense. *See Evans*, 44 F. App'x at 453. That is also the focus of § 3B1.3. The Tenth Circuit has explained that the "primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-

detect wrong." *United States v. Chee*, 514 F.3d 1106, 1118 (10th Cir. 2008) (citations omitted).

The Court finds that the government has not met its burden by a preponderance that Blaine used his position as an attorney to significantly facilitate the commission or concealment of the offense or to execute his scheme. There was no evidence presented that Blaine used his title opinion work for CLR to perpetuate the scheme, or that his title opinion work gave him a "leg up" or a "head start" in acquiring leases. Rather, it was the separate, insider information provided by Biggs that facilitated the fraud. Blaine's position as a title attorney for CLR was extraneous to the scheme.

Blaine met Justin Biggs in August 2011 at a skeet shoot. Their relationship was formed prior to Blaine doing any legal work for CLR. Subsequently, Biggs began sending some of CLR's title work to Blaine. Mr. Coatney testified that the purpose of the hunting trip in late 2013 was to "wine and dine" Biggs to continue to acquire title work from CLR. While on the trip, Biggs pitched the idea of providing insider information in exchange for kickbacks, like he had done before with another individual. Biggs testified that Blaine expressed interest while on the hunting trip, but he was unsure if Blaine was serious until he received the December 5, 2013 email. Thus, the evidence does not support the government's claim that Blaine would not have had access to Biggs' information without his attorney-client relationship with CLR. Biggs had provided insider information before to a non-attorney in exchange for kickbacks, and he suggested he do it again in exchange for kickbacks from Blaine.

Coatney testified that 99 percent of the lease assignments in Exhibit A to Government's Exhibit Nos. 1 and 5 came from information Mr. Biggs provided. Sometimes that information was derived from the map in Government's Exhibit No. 10; other times the information was how much CLR was willing to pay on the back end for leases. Mr. Biggs also updated the coconspirators in real-time, including telling them what to counteroffer CLR and by providing updated drill schedules. Mr. Coatney testified that this updated information from Biggs was everything because if they knew CLR was not actually going to drill a well, then the coconspirators would move to land with better prospects. Biggs also agreed that his real-time price updates to the coconspirators were a valuable part of the scheme.[12]

Blaine testified that he did not use any of the information CLR gave him to conduct title opinion work to acquire any of the leaseholds he sold back to CLR. Tr. at 8 [Doc. No. 275 at 8]. He indicated that "there was occasionally a time or two where paths crossed where [he] had done a title opinion," i.e., a person from whom they were acquiring the lease owned land in multiple sections. *See id.* at 9. However, he stated "it was not because they were directly using [his] title opinion to go after it . . . They were

---

[12] *See also* Jimmy Dyer's factual basis included in his Plea Petition at paragraph 48 [Doc. No. 192 at ¶ 48], which states in relevant part: "I was informed that Justin Biggs, a senior landman at [CLR] was going to provide information on where CLR was interested in buying leases for oil production. I was shown a map by Coatney who indicated that it was provided by Biggs. Based off this 'inside information,' as well as information on where not to buy leases, I went out as a landman, did research in the areas suggested by Biggs, and helped acquire leases for Enercore."

actually going after another section, and it just so happened that it was ancillary to the transaction." *See id.*

In summary, the government has not presented sufficient evidence to meet its burden by a preponderance that Blaine Dyer used his position as an attorney to significantly facilitate the commission or concealment of the offense. Mr. Dyer's conduct was unethical, for sure, but it does not meet the definition for application of the role adjustment under U.S.S.G. § 3B1.3; thus, the Court sustains Blaine Dyer's objection to paragraph 36 of the PSR.

Although it is not sufficient to qualify for an adjustment to the offense level, the Court may still consider it in arriving at a sentence under 18 U.S.C. § 3553(a). *See also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence."). Based on the above, Blaine Dyer's objections to paragraphs 39 and 43 are sustained in part and overruled in part. His adjusted offense level (subtotal) is now a 28, and his total offense level becomes a 25. Based on a total offense level of 25 and a criminal history category of I, the guideline imprisonment range is 57 to 71 months. With the statutory maximum of 60 months, Blaine Dyer's guideline range becomes 57 to 60 months; thus, this will change paragraph 83 of the PSR.

## C.    Restitution

It is undisputed that the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A applies, and restitution must be ordered in this case. *See* PSR at ¶ 102. Section

3664 governs how courts are to issue and enforce restitution awards for the MVRA. *See* 18 U.S.C. § 3664(a); *see also United States v. Salti*, 59 F.4th 1050, 1053 n.1 (10th Cir. 2023). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence" and the "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e).

"[T]he primary goal of restitution is to compensate [crime victims] for the entire losses they have suffered. *Salti*, 59 F.4th at 1056; *see also Paroline v. United States*, 572 U.S. 434, 456 (2014) (noting that "restitution is remedial or compensatory"). "Restitution must not unjustly enrich crime victims or provide them a windfall." *United States v. Ferdman*, 779 F.3d 1129, 1132 (10th Cir. 2015). To that end, a court ""may not order restitution in an amount that exceeds the actual loss caused by the defendant's conduct, which would amount to an illegal sentence constituting plain error."" *See id.* (quoting *United States v. James*, 564 F.3d 1237, 1243 (10th Cir. 2009)). "The court need not calculate the harms with 'exact precision,' but it must set a restitution amount that is 'rooted in a calculation of actual loss.'" *United States v. Anthony*, 942 F.3d 955, 970 (10th Cir. 2019) (quoting *Ferdman*, 779 F.3d at 1133); *see also United States v. Gallant*, 537 F.3d 1202, 1252 (10th Cir. 2008) (explaining that "absolute precision is not required" when calculating loss under the MVRA); *United States v. Kearney*, 672 F.3d 81, 100 (1st Cir. 2012) (explaining "the court need only make a reasonable determination of appropriate restitution" and that "the district court has leeway to resolve uncertainties

with a view towards receiving fairness to the victim") (internal quotation marks &
citations omitted).

The Court's order of restitution must be supported by the evidence, and
"[s]peculation and rough justice are not permitted." *Ferdman*, 779 F.3d at 1133 (internal
quotation marks & citation omitted). Section 3664 "appears to contemplate the exercise
of discretion by sentencing courts in determining the measure of value appropriate to [a]
restitution calculation in a given case." *James*, 564 F.3d at 1245 (quoting 18 U.S.C.
§ 3664(f)(1)(A), providing that a court orders "restitution . . . in the full amount of each
victim's *losses as determined by the court . . . .*") (emphasis added).

Here, the United States asserts that the actual loss to CLR and the gain realized by
Defendants is approximately the same. [Doc. No. 247 at n.3]. As the government points
out in its sentencing memorandum, some courts award a percentage of an employee's
salary to approximate an employer's financial loss in honest services fraud cases when "it
would be unduly complex to try to delineate which part of" an employee's work was
"honest." *United States v. Bahel*, 662 F.3d 610, 650 (2d Cir. 2011). The government
contends that the "better option, and the readily discernible calculation available here, is
an award of restitution 'in the amount of the difference in the value of the services that
[the dishonest employee] rendered and the value of the services that an honest employee
would have rendered.'"[13] [Doc. No. 247 at n.3] (quoting *Bahel*, 662 F.3d at 650). The

_____

[13] The government changes its position on using percentage of salary approach in
its later filings. *See* [Doc. Nos. 234 at 21 & 247 at 23–24, n.3]. Although the amounts for
offender gain and actual loss are roughly the same here, the Court's analysis for

government cites to *United States v. Sapoznik*, 161 F.3d 1117 (7th Cir. 1998) for support. The court in *Sapoznik* explained that what the victim employer "lost as a consequence of [the dishonest employee's criminal conduct] was not his salary, but the difference in the value of the services that he rendered [his employer] and the value of the services that an honest [employee] would have rendered." *See id.* at 1121. Had Biggs been honest, and had CLR had the benefit of an independent, honest broker, the evidence supports that CLR would have paid $2,466,185.43 less than it did for the lease assignments it purchased from Enercore.[14] *See* discussion *supra* at 17–18.

Additionally, the Court finds that restitution in that amount should be joint and several between Jimmy Dyer and Blaine Dyer only and subject only to an offset of $150,000.00 from CLR's civil recovery from Justin Biggs. The evidence of record is that Justin Biggs has already repaid CLR for his role in the scheme in addition to other conduct. *See* Government's Exhibit No. 12; *see also* [Doc. No. 251 at 20] (in which Blaine notes that most of "Biggs' ill-gotten gains were derived from other transactions he did with other parties" and the deal he made with Blaine "was only valued at $150,000.00"); [Doc. No. 199 at 11]; PSR at ¶ 15 (noting that Blaine submitted four cash payments to Biggs totaling $150,000.00). CLR is not seeking restitution from Biggs or

---

restitution purposes is not based on gain but is based on the difference in the value of the services an honest employee would provide versus a dishonest employee, relying on *Bahel* and *Sapoznik*. This analysis is in line with *United States v. Galloway*, 509 F.3d 1246, 1253 (10th Cir. 2007) because it is not based on gain.

[14] The government announced in its closing argument at the evidentiary hearing on April 8, 2024, that CLR was no longer seeking overriding royalty interest payments as part of its restitution.

Coatney and has reached an agreement with Jimmy Dyer. *See* [Doc. No. 282]. By statute, the Court can only offset an order of restitution "by any amount later recovered as compensatory damages for the same loss by the victim in any Federal civil proceeding; and any State civil proceeding, to the extent provided by the law of the State." 18 U.S.C. § 3664(j)(2). Under the MVRA, the defendant bears the burden of persuasion with proving an offset. *United States v. Howard*, 887 F.3d 1072, 1079 (10th Cir. 2018). Here, Blaine Dyer has met his burden of proving that the Court should offset only $150,000.00 of the $1 million paid by Justin Biggs to CLR. *See* Government's Ex. No. 12 at ¶ 4, in which Brent Johnson, assistant general counsel for CLR, notes that "the funds in excess of $150,000 paid by Biggs in the Civil Case are not related to the same loss for which [CLR] seeks restitution in the Criminal Case."

The Court, in exercising its discretion and considering the role each coconspirator played in the fraudulent scheme, adopts a joint and several restitution approach between Blaine Dyer and Jimmy Dyer. Numerous appellate courts have adopted a restitution approach that accounts for multiple defendants' varying degrees of contribution to a victim's total loss and reflects each defendants' level of culpability. *See, e.g.*, *United States v. Yalincak*, 30 F.4th 115, 127 (2d Cir. 2022); *United States v. Sheets*, 814 F.3d 256 (5th Cir. 2016); *United States v. Scott*, 270 F.3d 30 (1st Cir. 2001). In *United States v. Hand*, 863 F.2d 1100, 1106 (3d Cir. 1988), the Third Circuit upheld a district court's decision that placed the sole burden of paying restitution on one defendant, even though another defendant "was equally culpable." Additionally, the text of § 3664(h) recognizes that the Court has discretion to apportion restitution between defendants based on their

29

relative culpability and, if the Court so chooses, their financial means. *See* 18 U.S.C.
§ 3664(h).

Here, CLR does not seek restitution against Biggs or Coatney. Additionally, the
government asserts that Biggs has cooperated with the government and has already repaid
CLR for his role in the scheme, in addition to predominantly other conduct. Additionally,
the Court's order of restitution offsets the $150,000 paid by Biggs to CLR. The
government also asserts that Coatney has provided "invaluable cooperation," and he
received only $12,500 from the scheme. The Court also notes that the evidence reflects
that Blaine was the undisputed leader of the scheme, and he controlled the money and
kept most of the money for himself. *See* PSR at ¶ 37 (application of leader/organizer
role); *see also* Government's Exhibit Nos. 18, 21, 23, 24, 35, 39, 40, 42, 43, 45, 47, & 48.

This resolves the government's objections to paragraphs 25 and 26 of the PSR and
overrules Blaine Dyer's objections to paragraphs 25, 26, and 27. Again, Blaine Dyer has
the burden to prove any offset, and he has not provided sufficient evidence to offset the
restitution amount for any amount other than the $150,000 paid by Biggs to CLR. Thus,
the Court will order restitution to be paid joint and several by Blaine and Jimmy Dyer in
the amount of $2,316,185.43, which equals $2,466,185.43 minus the offset for
$150,000.00.

**D.    Forfeiture**

The government asserts that Jimmy and Blaine Dyer should forfeit their "ill-gotten
gains to the United States," and that both Defendants have already agreed to do so as part
of their plea agreements. [Doc. No. 247 at 21]. "A forfeiture judgment must be supported

by a preponderance of the evidence." *United States v. Bader*, 678 F.3d 858, 893 (10th

Cir. 2012). "Criminal forfeiture and restitution are separate remedies with different

purposes." *United States v. McGinty*, 610 F.3d 1242, 1247 (10th Cir. 2010). Criminal

forfeiture acts as "'an *in personam* action in which the forfeiture of and the vesting of

title in the United States in the defendant's tainted property is imposed as a punishment

against the defendant.'" *See id.* (quoting *United States v. Jarvis*, 499 F.3d 1196, 1203

(10th Cir. 2007)). By contrast, "[r]estitution is not punitive, but is instead designed to

compensate victims." *McGinty*, 610 F.3d at 1247.

"Because restitution and forfeiture are distinct remedies, ordering both in the same

or similar amounts does not generally amount to a double recovery." *See id.* Restitution

and forfeiture are not necessarily in the same amount because "restitution is calculated

based on the victim's loss, while forfeiture is based on the offender's gain." *See id.*

(citations omitted). "'[B]oth forfeiture and restitution [are] mandatory,' and '[n]othing in

the statutory scheme permit[s] the district court to reduce the mandated criminal

forfeiture order because the defendant also had to satisfy his obligation to pay

restitution.'" *United States v. Tolliver*, 730 F.3d 1216, 1233 (10th Cir. 2013) (quoting

*McGinty*, 610 F.3d at 1248).

The government asserts that post-*Honeycutt*, courts cannot hold members of a

conspiracy jointly and severally liable for a forfeiture money judgment. *See Honeycutt v.

United States*, 581 U.S. 443, 454 (2017). There appears to be a circuit split over whether

*Honeycutt* extends to forfeiture under 18 U.S.C. § 981(a)(1)(C). *See United States v.

Channon*, 973 F.3d 1105, 1115 (10th Cir. 2020) (explaining that, in *Honeycutt*, the

Supreme Court analyzed forfeiture under 21 U.S.C. § 853(a)). Here, the government

contends that it must prove what proceeds each member of the conspiracy individually

obtained. Without deciding the implications of *Honeycutt*, the Court finds that the

government has established by sufficient evidence that Blaine Dyer received

$1,661,263.42 in ill-gotten gains, and that is the amount he must forfeit to the United

States.

Agent Wildeman testified that he worked with an FBI forensic accountant to trace

the proceeds from Transactions 1 and 2, tracing the Enercore account ending in 1057 and

the Charger account ending in 8592. Government Exhibits Nos. 47 and 48 reflect the

flow of funds. Blaine received $1,386,263.42 from the Bank of Oklahoma Enercore

account ending in 1047 and $275,000.00 from the JPMorgan Chase Charger account

ending in 8592. *See* Government's Ex. Nos. 47, 48. Those two figures added together

total $1,661,263.42. Agent Wildeman also indicated that they traced the flow of funds

from Transactions 1 and 2 directly into accounts controlled by Blaine Dyer without

commingling from extraneous sources.[15]

**E.**      **Objections to Paragraphs 44, 45, & 46 of the PSR**

That leaves Blaine's objections to paragraphs 44, 45, and 46 of the PSR under

Offense Behavior Not Part of Relevant Conduct. This conduct appears to pertain to

Counts 9 through 11 of the Superseding Indictment and a foreclosure action in Oklahoma

---

[15] Similarly, Agent Wildeman and the FBI forensic accountant traced funds totaling $230,761.74 into accounts controlled by Jimmy Dyer, as reflected by the figure in the parties' Joint Notice [Doc. No. 282 at 2]. *See also* Government's Exhibit Nos. 47 & 48 ($208,811.42 plus $21,950.32).

County. Pursuant to the plea agreement, the government has agreed to dismiss at sentencing all counts of the Superseding Indictment, as well as all counts of the Indictment against Blaine. [Doc. No. 202 at 12]. Additionally, the alleged conduct outlined in these paragraphs has no impact on Blaine's advisory guideline range, nor does the Court intend to consider the matter in sentencing Mr. Dyer. Thus, the Court finds that a ruling is unnecessary under Federal Rule of Criminal Procedure 32(i)(3)(B) as to these three paragraphs.

III.  **CONCLUSION**

In summary, these are the findings and conclusions of the Court regarding the amount of loss and certain role adjustments for purposes of calculating the advisory guideline range, and the appropriate amount of restitution and forfeiture. The Court will take up its § 3553(a) analysis separately during the sentencing hearing set for May 30, 2024.

Entered this 30th day of May 2024.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE